**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 13 CR 731** |
| | ) | **Honorable Charles P. Kocoras** |
| **H. TY WARNER** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF A
<u>SENTENCE OF PROBATION WITH SPECIAL CONDITIONS</u>**

# TABLE OF CONTENTS

Page

Table of Contents……………………………………………………………………..…i

Table of Authorities……………………………………………………………….....iii

Relevant Factual Background…………………………………………………...…….2

   A. Personal and Business Life……………………………………………………..2

   B. The Offense Conduct…………………………………………………...…………6

   C. Charitable Contributions…………………………………………...…………10

   D. Remediation Efforts……………………………………………………...…..13

Argument…………………………………………………………..………………13

   1. The Nature of the Offense and The History and Characteristics of the Defendant……...15

      a. The Nature of the Offense……………………………………………………15

      b. The History and Characteristics of the Defendant…………………………...18

         (i)    No history of criminal activity coupled with decades of lawful and significant tax payments…………………………………………...…19

         (ii)   Businessman who overcame significant odds…………..…...……………19

         (iii)  Voluntary attempt to correct his errors and the extraordinary acceptance of responsibility it demonstrates…………………………..…..20

         (iv)  Numerous personal acts of charity, both large and small……………..…...20

         (v)   Caring businessman who nurtures his employees' growth……………...…21

         (vi)  Ty's age and physical health……………………………………………...…21

   2. The Purpose of Sentencing………...……………………………………………22

   3. The Kinds of Sentences Available……………...…………………………………23

      a. A Sentence of Probation with Home Confinement Is Appropriate…………...…24

      b. Support for Community Service Sanctions……………………………………25

4.  The Sentencing Guidelines………..……………………………………………………29

5.  Pertinent Policy Statements………..……………………………………………………29

6.  The Need to Avoid Unwarranted Disparities Among Similar Offenders………..…….…29

7.  The Need to Provide Restitution to Any Victims of the Offense………..…………...…33

Conclusion: A Sentence of Probation with Special Conditions Is Appropriate………..……....34

TABLE OF AUTHORITIES

Page

Cases:

*Gall v. United States*,
 552 U.S. 38 (2007)……………………………………………..……..…13, 23, 24
*Kimbrough v. United States*,
 552 U.S. 85 (2007)……………………………………………...……………..1, 15
*Koon v. United States*,
 518 U.S. 81 (1996)……………………………….....................................34
*Pepper v. United States*,
 131 S.Ct. 1229 (2011)…………………………...…………………………..14-15, 34
*United States v. Adelson*,
 441 F. Supp. 2d 506 (S.D.N.Y. 2006),
 aff'd 301 Fed. Appx. 92 (2d Cir. 2008)……………………………………………18
*United States v. Anderson*,
 267 Fed. Appx. 847 (11th Cir. 2008)……………………...……………………....20, 25
*United States v. Booker*,
 543 U.S. 220 (2005)…………………………...……………………………….....14
*United States v. Groos*,
 No. 06 CR 420, 2008 U.S. Dist. LEXIS 103705
 (N.D. Ill. Dec. 16, 2008)……………………………………………………………29
*United States v. Howe*,
 543 F.3d 128 (3d Cir. 2008)……………………………………………19, 25
*United States v. Milne*,
 384 F. Supp. 2d 1309 (E.D. Wis. 2005)…………………………………...22, 34
*United States v. Moore*,
 344 Fed. Appx. 767 (3d Cir. 2009)……………………………………...25
*United States v. Powell*,
 576 F.3d 482 (7th Cir. 2009)…………………………………………….....21
*United States v. Reyes-Hernandez*,
 624 F.3d 405 (7th Cir. 2010)……………………………….…………………....30
*United States v. Robertson*,
 662 F.3d 871 (7th Cir. 2011)………………………………………………14
*United States v. Roth*,
 No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603 (N.D. Ill. Mar. 11, 2008)……………22
*United States v. Rowan*,
 No. 06-321, 2007 U.S. Dist. LEXIS 2126 (E.D. Pa. Jan. 10, 2007)………………..…19
*United States v. Suarez-Reyes*,
 No. 8:12CR67, 2012 U.S. Dist. LEXIS 178771
 (D. Neb. Dec. 18, 2012)………………………………………………19, 30-31
*United States v. Tenzer*,
 213 F.3d 34 (2d Cir. 2000)…………………………………………..……...16, 22, 34

Statutes:

18 U.S.C. § 3553(a)………………………………………………………………passim
18 U.S.C. § 3561(a)(1)…………………………………………………...........23
18 U.S.C. § 3561(c)(1)……………………………………………………........24
26 U.S.C. § 7201………………………………………………………………..1

Miscellaneous:

U.S.S.G. § 3E1.1(b)…………………………………………………………….....1
U.S.S.G. § 5F1.2 (Commentary)……………………………………………….....24
*Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary*
    (April 30, 2010)…………………………………………………………..…...26
Court & Community: An Information Series About U.S. Probation & Pretrial Services:
    Community Service, Office of Probation and Pretrial Services, Administrative
    Office of the U.S. Court (2005)……………………………….................................25-26
Department of Justice Criminal Tax Manual § 4.01……………………………………9
*IRS Commissioner Makes Statement on Offshore Income*, Tax Notes Today
    (Mar. 26, 2009)………………………………………………………………….8
Sentencing Transcript from *United States of America v. Shamilzadeh*, 04-CR-194 (JG),
    (E.D.N.Y. 2008)…………………………………………………………………28

Defendant Ty Warner comes before the Court for sentencing after having pled guilty to a single count of tax evasion in violation of 26 U.S.C. § 7201. On the date of sentencing, Ty will have complied with all of the terms of the plea agreement, including payment of a $53 million Foreign Bank Account Report ("FBAR") penalty and at least $16 million in back taxes and interest. Ty submits the following sentencing memorandum to assist the Court in determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a).

The parties agree, subject to the Court's approval, that Ty's offense level, before applying any reductions for acceptance of responsibility, is twenty-six (26). The offense level should be reduced by two levels for acceptance of responsibility and by an additional one level if the Court grants the government's anticipated motion for an additional one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b). If the Court agrees with the parties' computations, Ty's final adjusted total offense level will be 23, resulting in an advisory Guideline range of 46-57 months (Criminal History Category I). (*See* Presentence Report ("PSR") ¶ 30.) However, the advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (*quoting* § 3553(a)).

Respectfully, when all factors in this case are considered—including: (i) the defendant's extraordinary acceptance of responsibility, including his unprompted effort to join the IRS voluntary disclosure program; (ii) his payment of extremely high financial penalties and restitution in excess of $65 million; (iii) his lifelong support of charitable activities; and (iv) the sentences imposed by the majority of courts on similarly situated defendants—a sentence of probation with special conditions of community service that satisfies all the objectives of sentencing.

## RELEVANT FACTUAL BACKGROUND

**A.     PERSONAL AND BUSINESS LIFE**

Ty emerged from an unhappy family and a youth devoid of educational advantages to become, through decades of hard work and extraordinary creativity, a self-made American success story. Along the way, he employed thousands, including many from similarly modest roots whom he helped achieve success and security; he conceived of and delivered an affordable, highly desirable product that brought joy and comfort to millions of children; and he attained a personal fortune that allowed him to make significant contributions of his time, assets and business expertise to several communities as well as to charitable organizations supporting important causes with an emphasis on the well-being of underprivileged children.

Ty was born in Chicago, Illinois on September 3, 1944. His home life was challenging as described in paragraphs 44-47 of the PSR. At age 15, Ty was sent from home to St. John Military Academy in Delafield, Wisconsin. After high school, Ty worked several menial jobs in order to earn enough money for college. He enrolled at Kalamazoo College in 1962, but was forced to drop out after one year because he could no longer afford tuition. With no family help or support, Ty was unable to return to his home or to college. He was classified 4F by the U.S. Selective Service System because of hearing loss and was unable to serve in the armed forces. Ty's mother suffered mental illness during his childhood and, in the late 1970s, was diagnosed as paranoid schizophrenic at Elgin Mental Hospital, where Ty took her for treatment. Ty's father played little or no role in the care of Ty's mother.

Ty took whatever jobs he could find to make ends meet. At various times he was a busboy, bellman, valet car parker, and fruit market vendor. He also sold cameras and encyclopedias door to door. It was not until Ty became a sales representative for the Dakin Toy

Company of California that he began to develop the confidence in his abilities that would ultimately lead to his success in business.

Dakin manufactured figurines and stuffed animals—or, as they are known in the industry, "plush toys." Ty started with Dakin in the mid-1960s as a salesman visiting retail stores. Although he had been a door-to-door salesman, his experience selling toys was different. Ty especially enjoyed selling a product intended for children, and he developed a keen sense of what particular plush toys children enjoyed. Ty became an expert in the products he was selling, focusing on the color, expression, size, and quality of every toy. After only a few years, he became Dakin's number one salesman.

In 1985, Ty set out on his own and formed Ty Inc. He designed and brought to the market a small collection of plush toy cats. The marketplace responded favorably, and Ty Inc. gradually added new products. The new company had no employees and was funded with a second mortgage on Ty's condominium in Hinsdale, Illinois. For years, Ty operated the business out of that condominium. Inventory was delivered to the condo, and Ty filled orders himself by packing boxes and driving them to the post office for delivery. He designed, promoted, sold, and shipped every item Ty Inc. sold.

Then, in the early 1990s, Ty introduced a new product that would change the plush toy industry forever: the Beanie Baby. Beanie Babies were unlike any plush toy that had come before. Although manufactured to extremely high-quality standards, they were intended to be inexpensive enough ($5) that children could buy them with allowance money. They were small enough to fit into a backpack or coat pocket. They were filled with plastic pellets, which made them poseable. Uniting these qualities in one product is the genius of the Ty Warner story. His attention to detail and to the aesthetic aspects of his products defines his strength as a business

-3-

leader. While he entrusted corporate matters to the executives, lawyers, and accountants he employed, Ty treated the final decision about the particular fabric or color of the company's next Beanie Baby as a non-delegable assignment. For Ty, that type of decision went to the very heart of the business and required his full attention. After the spectacular success of Beanie Babies turned Ty Inc. into a multi-billion-dollar company in the mid-1990s, Ty's interest in the role of design and aesthetics in business led him to invest in the hotel and resort industry. Again, Ty delegated property management, legal, and financial affairs to others, leaving himself the time and space to focus on his passion for design.

Ty has never forgotten his experience as an underdog facing tremendous odds. On the contrary, Ty's personal challenges resulted in his lifelong, personal commitment to helping others overcome obstacles.

Letters of support submitted to the Court, many written by current and former employees, reflect not just the occasional helpful gesture, but instead the individual and personal impact Ty has had on the lives of employees from various levels of the company and various geographic locations. For example, Steven Gomez recounts how Ty personally reached out to him and taught him to become a better salesman and to develop executive skills. With Ty's help, Steven is now the Director of Ty UK, Ty Inc.'s subsidiary in the U.K. Steven attributes his professional success directly to Ty's personal involvement in his development. Ty's support was not just professional, he also helped Steven's wife after she was diagnosed with multiple sclerosis. Ty offered to send her to Johns Hopkins for treatment and made sure that Steven's work schedule permitted him to care for her. Similarly, the letter of Jose Verger, a VP of Sales, describes how Ty made sure that Jose had enough time to care for his wife when she was seriously ill, called twice a day, and never asked how long Jose would be away from work. Jose describes Ty as

-4-

"the most generous, kind and giving person I have ever known." These examples are

compelling, but for Ty they are routine, as demonstrated by the numerous letters submitted to the

Court, only a few of which are summarized here:

- Jennifer Vasilakos, a stranger to Ty, was in a parking lot trying to raise funds for a life-saving kidney procedure she required when Ty drove up to ask for directions. After learning of her situation by reading her flier, Ty provided funding for her treatment. As her letter states, "[Ty] didn't have to return after reading my flier. He chose to do so."

- Chris Johnson, employed by Ty for over two decades, recalls how Ty let him live in his home so he could save money while he completed college. Years later, Ty provided personal support when Chris' wife had complications during child birth, providing the time and resources he required to take care of his family during the crisis. Chris also explains that Ty's example has inspired him to engage in his own charitable works and helped him develop compassion for those struggling with adversity.[1]

- Another employee, David Grana, is thankful that during a series of surgeries to correct a serious problem with his eye in 2005, Ty provided him over six months of leave from work. Ty also arranged for him to be evaluated by an expert on his condition at Johns Hopkins in Baltimore.

- Mark Swallow, the chairman of Ty UK, remembers that he and Ty learned that the son of one of the company's employees in China contracted a rare infection that interfered with brain and limb function. Ty arranged for the boy to be evaluated with his parents at the Mayo Clinic.

- Peter Gygax is the CEO of a European toy distributor who has witnessed both the organizational and personal impact of Ty's philanthropy. In his letter, Mr. Gygax described Ty's efforts to help rebuild a children's hospital in Japan after the Fukushima disaster as well an occasion when Ty provided financial assistance so that a handicapped child could receive much needed surgery. Gygax recounted, "I saw the boy one month later walking for the first time in his life, I will never forget this moment."

- Another former colleague, Sharon Altier, describes a number of similar examples in her letter. These include personally researching the best doctor for an employee diagnosed with cancer, creating positions for an employee where the correct

---

[1] Mr. Johnson was interviewed by the pre-sentence investigator in this case. The PSR notes that Mr. Johnson described Ty as "more calculating." Ty does not believe this issue requires resolution by the Court nor is it material to one of the § 3553(a) factors, but the Court should be aware that Mr. Johnson denies using the term in the interview.

business decision was to let her go, and allowing a police officer to use one of Ty Inc.'s warehouses to start a dog training business.

- Another former employee, Irene Robles-Robledo, recalls Ty's reaction when she was diagnosed with colon cancer: "When Ty found out he told me not to worry about my job or anything just focus on getting through surgery and recovering."

- One employee, Patrick Crispo, describes "spontaneous acts of generosity," including when Ty gave his car to an employee who had been saving to purchase one.

Ty always wants to make a difference, whether it is to help a current employee, a former colleague, a charitable organization, or even an ailing stranger handing out flyers at a shopping center. When Ty steps up to provide assistance, it is most often with very little fanfare and no attention-grabbing headlines. These letters from individuals provide insight into Ty's character and reflect his generosity on a personal level for those around him facing adversity.

A commitment to large-scale philanthropy has also played an important role in Ty's life. Ty's contributions to charitable organizations are discussed in detail in Section C below. Those charitable contributions were made without regard for tax consequences. In fact, over the years Ty has allowed nearly $16 million of charitable tax deductions to expire unused.

Ty is far from the only beneficiary of his business success. In his lifetime, he has paid approximately $1 billion in income taxes. Ty Inc. created thousands of jobs, including highly profitable careers for many of its early employees, some of whom rose from hourly wage jobs to become millionaires. Ty overcame adversity and accomplished all this—his own success, job creation and opportunities for others, charitable works, and so many other good things—and he made a terrible mistake.

## B.    THE OFFENSE CONDUCT

It was amid his early significant financial success with Beanie Babies that Ty opened a Swiss bank account. Suddenly and quite unexpectedly, Ty, at age 51, found himself with

substantial wealth for the first time in his life. Polished and experienced Swiss financial advisers (now indicted fugitives) counseled Ty to open a Swiss bank account for safekeeping some of his assets. The Swiss financial advisers helped Ty create and open an account at UBS in January 1996, beginning Ty's failure to report the foreign account on his tax returns. That conduct continued after 2002, when the same Swiss financial advisers counseled Ty to let them transfer the account's funds out of UBS.

Ty received periodic oral updates regarding the account and was aware that it was generating income. Unlike the majority of similarly situated account-holders, however, Ty never once used—or even withdrew—any funds in the account. Moreover, the funds were never returned to the United States before they were recently used to satisfy the terms of Ty's plea agreement with the government. After he opened the Swiss account in January 1996, Ty later regretted it and wanted to rectify his failures. He felt trapped, however, by his prior tax returns and non-compliance. In 2009, Ty learned of the government's investigative interest in offshore accounts generally. At this time, he was aware of the government's widely publicized interest specifically in UBS and of the indictment of one of the bankers he had dealings with, who was a fugitive. Ty contacted his long-time lawyer to see if there was a way to return to full compliance and rectify his failure to report the Swiss account. His attorney advised him of the IRS's offshore voluntary disclosure initiative ("OVDI") specifically created in March of 2009, which enabled taxpayers who voluntarily disclosed their offshore accounts to pay back taxes, interest, and a penalty without facing criminal prosecution. Ty believed he had finally discovered a safe path toward full compliance with the tax laws.

Accordingly, in September 2009, Ty applied to the IRS for entry into the program. Unlike many of the tens of thousands of U.S. taxpayers with unreported offshore accounts who

were admitted into the IRS's voluntary disclosure program, Ty never received a communication

from his bank notifying him that his account information would soon be turned over to the U.S.

government. Consistent with 60 years of IRS voluntary disclosure policies, the offshore

disclosure program created in 2009 was available only to non-compliant taxpayers who came

forward before being audited or investigated by the IRS.

The OVDI program was heavily publicized by the IRS. Commissioner Douglas Shulman

was repeatedly and widely quoted in the media touting this program as a safe and advantageous

way to resolve prior tax non-compliance. In announcing the first of three IRS disclosure

programs, the Commissioner stated:

> My goal has always been clear – to get those taxpayers hiding
> assets offshore back into the system. . . . [W]e draw a clear line
> between those individual taxpayers with offshore accounts who
> voluntarily come forward to get right with the government and
> those who continue to fail to meet their tax obligations. People
> who come in voluntarily will get a fair settlement. . . . Those who
> truly come in voluntarily will pay back taxes, interest and a
> significant penalty, but can avoid prosecution."

*IRS Commissioner Makes Statement on Offshore Income*, Tax Notes Today (Mar. 26, 2009).[2] In

a tax enforcement system with limited resources and a great need for encouraging self-correcting

behaviors, the Commissioner's simple statement is an understandably clear call for voluntary

compliance and disclosure.

Because Ty was neither under audit nor on notice of any investigation, he fully expected

to be admitted to the OVDI. However, unbeknownst to Ty and his counsel, Ty's name was on a

list of 285 names provided by UBS in secret to the Justice Department on February 18, 2009 as

---

[2] Counsel will provide a courtesy copy to the Court and the government on January 2, 2014 of all
unpublished cases and other materials cited in this brief that may not be readily accessible.

part of UBS's efforts to avoid criminal prosecution in the United States.[3]  The individuals on that

list would apparently be forever excluded from making a voluntary disclosure because the IRS

has taken the position that they failed the "timeliness" test.  Notwithstanding the fact that these

taxpayers did not know their names had been turned over, and regardless of whether the IRS had

actually taken any investigative steps, the government decided that its mere receipt of the list

constituted the initiation of an investigation.  Accordingly, Ty's counsel received a letter on

October 22, 2009, stating that Ty's application had been rejected.

Ty's efforts to rectify his mistake nonetheless continued.  He authorized counsel to

approach the Justice Department and the lead prosecutor in the offshore account cases to request

an opportunity to make a full disclosure pursuant to a Tax Division voluntary disclosure practice.

Department of Justice Criminal Tax Manual § 4.01.  Neither the IRS nor the Justice Department

provided any substantive response to these repeated requests from that time until two years later,

when, in September 2011, a grand jury subpoenaed Ty for his offshore banking records.  Ty and

his counsel are not aware of any investigative steps taken during the nearly two years between

the rejection of Ty's application to the voluntary disclosure program and the issuance of the

September 12, 2011 grand jury subpoena to Ty asking that he produce his own records.

On October 2, 2013, Ty pleaded guilty to one count of tax evasion for his amended 2002

calendar year tax return filed in 2007.  Pursuant to the plea agreement, he has agreed to file

amended tax returns and will make payments in excess of $16 million in back taxes and interest

as well as a $53,552,248 FBAR penalty based on the maximum civil penalty Ty could have

---

[3] According to the PSR, Special Agent Larson stated that the IRS learned of Ty's Swiss accounts "'a few years' before UBS turned over client account information to the United States." (PSR ¶ 14.)  That statement in the PSR marks the first time any government official has suggested to Ty or his counsel that the IRS first learned of Ty's account before it received the list of 285 names from UBS in February 2009.  However, the government has not asserted that Ty had knowledge of the government's interest in his account before his counsel attempted a disclosure.  Whatever initial information the government may have had, Ty was not aware of it and applied to the program in good faith.

faced—50% of the highest balance of the unreported offshore account—for a failure to file an FBAR.  By contrast, those admitted to the OVDI program paid an FBAR penalty, without any notoriety or publicity, of only 20%.

Ty fully understands the gravity of his crime and his culpability in committing it.  He knew it was unlawful to evade taxes on the income from this account, and he accepts responsibility for his conduct.

## C.    CHARITABLE CONTRIBUTIONS

Despite the incredible success of his business, Ty never lost sight of his own humble beginnings.  For this reason, Ty dedicated his life not just to his businesses but also to philanthropic work, with a particular emphasis on supporting charities that help children and humanitarian causes.  Ty's many philanthropic activities have included multi-million-dollar gifts to assist underprivileged children, the Red Cross, pediatric AIDS funds, and other worthy causes.  Since 1995, he has donated nearly $140 million in cash and toys to various charities and organizations.

Ty's association with the Children's Hunger Fund is illustrative.  As Children's Hunger Fund President and Founder Dave Phillips describes in his letter to the Court of November 6, 2013, Ty has on several occasions answered the call for product donations, giving the charity plush toys valued at $70,880,832.  These toys were distributed to children "in orphanages, cancer treatment facilities, hospitals, slums and villages, inner cities, poor rural areas and disaster-stricken areas."  As described by Mr. Phillips:

> While I do not have a personal relationship with Ty, I can speak to the scope and impact of his generosity.  The magnitude of his contributions to the next generation is immeasurable.  He has been instrumental in restoring hope to countless children around the world who have been negatively impacted by poverty, famine, disease, or disaster.  When we have needed Ty the most, he has

> been there to answer the call and respond to our most urgent
> needs. . . . Mr. Warner's personal generosity is unprecedented in
> my personal experience of more than 30 years of leadership in the
> non-profit sector. . . . While we have offered numerous times in
> the course of our relationship to publicize or promote Ty's
> generosity to [the fund], in every instance he has humbly requested
> that no special efforts be made to publicly acknowledge his
> philanthropy.

As the letters from the Westmont Park District and Mayor's Office demonstrate, Ty aims to benefit his community by making life better for others living there. After acquiring a vacant lot near Ty Inc.'s headquarters in Westmont, the Village lacked the funds needed to develop the property into the modest park it planned. So Ty stepped in to help. In fact, according to Westmont Mayor Ronald Gunter:

> Ty's involvement grew to the point where he became the visionary
> for the project. . . . With additional property acquisition, project
> design, and then several years of committed maintenance to the
> project, Ty Warner committed more than $12 million to the success
> of the park. Without any prompting by Ty or his organization, the
> Westmont Park District felt it only fitting that the park be named
> after the citizen who invested so much time, passion, and money
> into the project. On July 4, 2000, the park was officially opened to
> the public and dedicated as Ty Warner Park. . . . Without his
> incredible generosity, the reality of this wonderful, first-class park
> would not have been realized.

The Santa Barbara community, where Ty's hotel and resort interests are headquartered, has also experienced the dramatic impact of Ty's good works. Mr. Stanley Los, a retired 25-year veteran of the FBI, met Ty while raising funds for the crew of the USS Ronald Reagan (CVN-76) as part of his work for the Santa Barbara Council of the Navy League. Ty suggested that he personally design a Beanie Baby dedicated to former President Ronald Reagan and assign 100% of the profits to the ship's crew. He followed through on that idea, and after a successful sales run, Ty presented the Navy League with a check for $750,000 to be used for the benefit of the

ship's crew. Another 24,000 of these commemorative Beanie Babies were donated by Ty for the benefit of the crew's Morale, Welfare and Recreation Fund.

These are just a few examples of Ty's extensive charitable works. Some of Ty's additional charitable contributions include the following:

- More than $21 million to the Princess Diana Memorial Fund derived from sales of a toy Ty designed specifically to benefit this charity in 1997 and 1998. Donations to the fund have been used to support other charities worldwide in a wide array of endeavors including refugee support, support to the victims of armed conflicts, and health services, with a specific focus on palliative care for those infected with HIV/AIDS.

- Since 2000, millions of dollars in toys donated to the Children's Hunger Fund, including donations both before and after the organization recognized him as its Children's Champion Award for 2006 as described in the letter of Dave Phillips. Most recently, plans are underway for a major product donation in January 2014 to benefit the victims of the 2013 catastrophic typhoon in the Philippines.

- More than $7.5 million in toys to World Vision, a children's humanitarian organization.

- $6 million to the Andre Agassi Foundation for underprivileged children in Las Vegas.

- 1 million Beanie Babies for children in Iraq.

- More than $1 million in toys to Toys for Tots.

- Approximately $4 million worth of toys to the American Red Cross.

- Generous support for his local communities, including millions of dollars for the creation of a park in Westmont, IL and $1.5 million for a sea museum in Santa Barbara, California from 2004 to 2006.

- $2 million to the President of the Japanese Red Cross and the CEO of Save the Children Japan in Tokyo for those organizations' relief efforts.

- Creation of Beanie Babies designed specifically for charities (with proceeds from those Beanie Babies' sales benefitting those charities), raising millions of dollars for organizations such as the Elizabeth Glaser Pediatric AIDS Fund, the American Red Cross, and the Susan G. Komen Race for the Cure.

Ty's willingness to quietly give millions of dollars away to worthwhile causes demonstrates a commitment to help others, rather than a strategy to enhance his own celebrity or maximize his personal wealth. In fact, Ty has routinely let nearly $16 million of tax deductions earned through his charity work expire unused. These acts are consistent with other facts of Ty's financial life that belie any fixation on personal wealth. For years, he has carried tens of millions of dollars in net operating loss carry forwards for tax purposes, and even after paying all the taxes in this matter, will still have in excess of $130 million in net operating losses on his current return. He has not structured his businesses to avoid paying taxes at all costs, unlike some companies that have chosen to designate foreign countries as their "home" solely for tax purposes. Counsel for Ty was stunned to learn that he does not even have a current will nor any structure designed to minimize estate taxes. Simply put, his financial life has not been driven by tax consequences.

## D.    REMEDIATION EFFORTS

Ty has already paid an extraordinary FBAR penalty in excess of $53 million and will file amended tax returns for tax years 1999-2008 and pay all taxes and interest due before the sentencing hearing scheduled for January 14, 2014. The $53 million payment is the largest such FBAR penalty that his counsel are aware of.

## ARGUMENT

In *Gall v. United States*, 552 U.S. 38, 50 (2007), the Supreme Court stated that a district court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented." Furthermore, the Court rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines'

advisory range. *Id. a*t 47. Finally, the Court rejected the use of rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified. *Id.*

Accordingly, after calculating the proper offense level under the Guidelines and giving the government and the defendant the opportunity to argue for the sentence they believe to be appropriate, the district judge must consider each of the § 3553(a) factors and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker,* 543 U.S. 220, 245 (2005). The import of *Booker* is that "sentencing judges have broad discretion to impose a non-guideline sentence by weighing the factors under § 3553(a)." *United States v. Robertson*, 662 F.3d 871, 875 (7th Cir. 2011). The § 3553(a) factors include:

(1)    the nature of the offense and history and characteristics of the defendant;

(2)    the purpose of sentencing;

(3)    the kinds of sentences available;

(4)    the Sentencing Guidelines;

(5)    the policy statements issued by the Sentencing Commission;

(6)    the need to avoid unwarranted disparities among similar offenders; and

(7)    the need to provide restitution to any victims of the offense.

Application of the § 3553(a) factors to this case leads to the conclusion that a sentence of probation with a special condition of community service as more fully described below (plus either a fine, home detention, or some combination of these activities) is appropriate. Indeed, this case exemplifies why the Supreme Court rejected mandatory and mechanical application of the Sentencing Guidelines and restored district courts' discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*,

131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted). The factors addressed below, both individually and in combination, take this case out of the heartland of criminal tax cases with similar guidelines ranges and illustrate why probation is a punishment "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough*, 552 U.S. at 111.

1.      **The Nature of the Offense and The History and Characteristics of the Defendant**

        a.      **The Nature of the Offense**

Ty stands by his plea; he acknowledges his guilt, and nothing in this section is intended to diminish the wrongfulness of what he did. However, Ty's efforts to voluntarily disclose his noncompliance, his filing compliance from tax year 2008 forward, and his acceptance of full responsibility are highly relevant to the nature of his offense.

Section 6 below discusses sentences given to defendants convicted of the same offense. It bears emphasis, however, that Ty's *behavior* was no different legally or factually from that of tens of thousands of taxpayers who were *never* sentenced—or even prosecuted—because they were admitted into IRS voluntary disclosure programs.

Ty's application to the 2009 disclosure program was rejected, at least in part, because, unbeknownst to him, anonymous Swiss UBS bank officials sent his name and the names of 284 other account-holders to the U.S. government. The bank officials turned over this information without notifying Ty that they were going to do so and thereby deprived him of an opportunity to make a timely voluntary disclosure—the same opportunity afforded to thousands of similarly situated account-holders who responded by applying for and being admitted into the IRS voluntary disclosure programs. In fact, the Department of Justice later specifically acceded to UBS's subsequent efforts to protect its customers by allowing UBS to notify those customers, in advance, that their names would soon be passed to U.S. authorities, and advising those customers

of available IRS disclosure programs and urging them to apply for entry. Moreover, it is clear that the majority of the original UBS 285 bank clients will not be prosecuted. Only approximately 100 offshore account cases have been charged in the last five years, and dozens of those were not UBS cases. So with limited resources and expiring statutes of limitations, it is clear that the majority of the UBS 285 clients will never be prosecuted. In fact, some of the UBS 285 clients did receive notification from UBS prior to the February 2009 release of names to the government, allowing those clients to successfully make voluntary disclosures.

Although Ty did not qualify to enter the OVDI by its technical terms, this Court should still consider Ty's efforts to enter the program when fashioning a sentence. *See United States v. Tenzer*, 213 F.3d 34, 41-44 (2d Cir. 2000). In *Tenzer*, the defendant, a tax attorney and accountant who failed to file returns or pay taxes for years, attempted to enter one of the IRS's voluntary disclosure programs. *Id.* at 36-37. He did not meet the terms of the program and was prosecuted. *Id.* The appellate court concluded that the district court erred when it found that it could not consider the defendant's attempt to enter into the IRS's voluntary disclosure program as a basis for imposing a lower sentence. *Id.* at 43-44. Notably, *Tenzer* pre-dates *Booker* and, thus, reached this conclusion at a time when the guidelines were mandatory and district courts had much less discretion when determining an appropriate sentence.

Had Ty been accepted into the disclosure program as advertised by the IRS Commissioner, his sanction would have been to file amended returns for the prior six years (not the 10 years Ty is amending) and pay a 20% FBAR penalty, not 50%—or more than $30 million less than what he has paid pursuant to his plea deal. Moreover, had Ty been admitted into that first OVDI program, he would not have been subjected to a criminal investigation and public prosecution resulting in his current status as a widely-publicized felon. The OVDI sanctions

-16-

would have been conducted within the provisions and protections of tax secrecy, sparing him from not only the specter of incarceration, but also public embarrassment.

It is important to note that although the first IRS offshore disclosure program (to which Ty applied) ended on October 15, 2009, the IRS opened a second program in 2011 that closed only in September 2011, the same month the grand-jury investigation into Ty's account began. Yet a third IRS offshore disclosure program was announced in January 2012 and currently remains open. Therefore, account-holders who waited more than four years longer than Ty did to disclose their accounts are successfully entering the disclosure program and, thus, avoiding the severe consequences that Ty faces for the same offense. This includes account-holders who, like thousands before them but unlike Ty, applied only in response to a notice from their bank that their names would soon be turned over to the IRS. Just in August of 2013, the Justice Department announced a voluntary disclosure program for the Swiss banks that orchestrated and profited from these activities.

In addition, from the time of his first approach to counsel in the fall of 2009, Ty included the income from his offshore account in his annual tax return and made the FBAR filings at the next required date. That is, since the 2008 tax year—the past five years—Ty has been tax compliant and has reported this income on his annual return.

For all the prior tax years at issue in this prosecution, Ty's exceedingly complex tax returns were prepared by professionals. Each year's tax return contained thousands of pages. Ty does not deny he failed to advise these professionals of his personal Swiss bank account. However, the tax professionals who prepared Ty's returns were thoroughly aware that Ty had FBAR-reportable ownership interests in dozens of foreign accounts related to his business interests that were fully and accurately reported on Schedule B of his tax returns each year—yet,

-17-

inexplicably, they never advised him of the requirement to file FBARs, nor prepared any for him to sign. This fact does not minimize Ty's culpability for his tax crime, but it illustrates that no evidence whatsoever suggests Ty was aware of the FBAR form or filing requirement before 2009. Nonetheless, as a condition for entering this plea, Ty agreed to pay $53,552,248, the maximum FBAR penalty he could have faced for a *willful* violation in any given year, rather than the $10,000 maximum penalty for non-willful violations.

### b. The History and Characteristics of the Defendant

Ty's history and character lead to one conclusion—the crime to which he has pleaded guilty is an aberration, stemming from a single, regrettable decision to open the account almost 20 years ago. There is no denying the seriousness of what he has done or that Ty compounded this error with each year's tax return. That is why Ty first attempted to enter into the OVDI and, subsequently, pleaded guilty. This episode, however, is an isolated series of events that stands in stark contrast to nearly seven otherwise exemplary decades. One court aptly summarized the importance of the consideration of a defendant's history and characteristics as part of the analysis under § 3553(a):

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd* 301 Fed. Appx. 92 (2d Cir. 2008). Keeping these principles in mind, the Court should consider the following indisputable facts, and what those facts say about Ty:

### (i) No history of criminal activity coupled with decades of lawful and significant tax payments.

Outside of the conduct at issue in this case, Ty has never been charged with a crime of any sort. He is not a career criminal; his one bad decision does not exist in a vacuum. *Ty has paid approximately $1 billion in income taxes during his lifetime.* The tax loss for sentencing guidelines agreed to in this case is approximately $5.5 million. While that is a large loss, it is dwarfed by the large payments Ty lawfully and timely made over the decades. *See United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (affirming below guideline sentence based, in part, on finding that defendant guilty of two counts of wire fraud had made an "isolated mistake"). Moreover, the fact that Ty held the overseas accounts for years does not alter the fact that his conduct in this case amounts to a contained series of events constituting a single exception to an otherwise law-abiding life. *See id.*; *United States v. Suarez-Reyes*, No. 8:12CR67, 2012 U.S. Dist. LEXIS 178771, at *16-18 (D. Neb. Dec. 18, 2012); *United States v. Rowan*, No. 06-321, 2007 U.S. Dist. LEXIS 2126, *26-30 (E.D. Pa. Jan. 10, 2007) (imposing sentence of probation with home confinement for mail fraud conviction based on defendant's history and isolated nature of crime in that history).

### (ii) Businessman who overcame significant odds.

As noted above and in the PSR, Ty grew up in a challenging home environment and received little financial or emotional support during his rise. He succeeded in building businesses that have employed thousands over the years, made many people wealthy, and brought joy to countless children. For all his sophistication with respect to the design and manufacture of plush dolls, and the beauty and design of hotel properties, he remains a relative novice when it comes to financial issues. Ty is not a CPA or finance expert, and has no college degree. He succeeded in spite of these gaps in his knowledge and experience due to his singular

focus on the design of his products. These facts may not excuse his conduct, but they help explain how he came to make his mistake.

### (iii)     Voluntary attempt to correct his errors and the extraordinary acceptance of responsibility it demonstrates.

As noted above, Ty attempted to correct his mistake. He applied to the OVDI in autumn 2009, long before he knew the government was investigating him; he was not subpoenaed by the grand jury until September 2011. Once it was clear that charges would be authorized, he negotiated an early plea. As part of that plea, Ty agreed to pay an unprecedented civil penalty of more than $53 million, approximately ten times the tax loss for sentencing guidelines purposes. But his efforts do not stop there, as Ty has also agreed to file the amended returns as indicated above. These actions demonstrate Ty's many efforts to fully accept the consequences of what he has done. *See United States v. Anderson*, 267 Fed. Appx. 847, 849-50 (11th Cir. 2008) (holding defendant guilty of insider trading demonstrated acceptance of responsibility by paying large civil fine before sentencing, supporting a sentence of home confinement).

From the time Ty attempted to enter the program in 2009, he has included the income from the Swiss account on his tax returns and filed the necessary FBARs. Neither he nor his Swiss advisors have moved the money in the account since that date.

### (iv)     Numerous personal acts of charity, both large and small.

Ty will not catalogue all, or even the majority, of his charitable acts here. But his charity goes beyond the typical level, even for a wealthy defendant, helping both large groups and isolated individuals, as well as giving back to local communities. This is a pattern of giving that goes back more than a decade before this case came to light. At the macro level, Ty makes large donations of money and products to major charities, both as a matter of course and in response to natural disaster such as the major Japanese earthquake in 2011 and the 2013 typhoon in the

Philippines. He has also helped individuals, indeed total strangers, such as when he paid the medical bills of a woman kind enough to provide him with driving directions. Most importantly, his charity is personal because he gives of himself. Ty does not simply donate products or money. As the letters submitted to the Court amply demonstrate, he also invests his time and personal attention, whether it is to design and market a plush toy for a particular charitable cause, or to arrange for the best doctor available to treat a medical problem faced by employees or their family members.

### (v) Caring businessman who nurtures his employees' growth.

Finally, the letters submitted to the Court by Ty's current and former employees also demonstrate that Ty does not just employ people, he helps them build their careers and their lives. He rewards them financially and, when they have problems, he tends to them personally. These letters speak for themselves. The continued development of Ty's businesses, and his relationships with his employees, will be jeopardized if he is incarcerated.

### (vi) Ty's age and physical health.

This Court may also consider Ty's "physical impairments and advanced age when determining the sentence it believes appropriate under 18 U.S.C. § 3553(a)." *United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (remanding case for new sentencing hearing considering these factors). At age 69, Ty is no longer a young man. Moreover, he suffers from a number of medical conditions that may be exacerbated if he is incarcerated, including: high cholesterol, bilateral hip osteoarthritis, degenerative spondylosis of the lumbar, and plantar fasciitis. (PSR ¶ 61.) Ty was diagnosed with prostate cancer, which is now stable, in 2009. (*Id.*) He also suffers from mild to moderate hearing loss. (*Id.* ¶ 64.) Ty currently takes approximately seven medications. (*Id.* ¶ 65.)

2.      **The Purpose of Sentencing**

Each sentence imposed under the Guidelines should be determined based on the relevant

facts and circumstances, and designed:

    (A)     to reflect the seriousness of the offense, to promote respect for the
            law, and to provide just punishment for the offense;
    (B)     to afford adequate deterrence to criminal conduct;
    (C)     to protect the public from further crimes of the defendant; and
    (D)     to provide the defendant with needed educational or vocational
            training, medical care, or other correctional treatment in the most
            effective manner.

18 U.S.C. § 3553(a)(2).

A lengthy (or any) sentence of imprisonment is not necessary in this case to "reflect the

seriousness of the offense" or "to promote respect for the law." The indictment and collateral

consequences, including the enormous FBAR penalty and widespread dissemination of information

about these proceedings, convey the seriousness of, and provide significant punishment for, this

offense. Moreover, Ty demonstrated early and complete acceptance of responsibility for his

conduct, confirming his respect for the law, the government, and this Court. *See Tenzer*, 213

F.3d at 43-44 (holding court could consider acceptance of responsibility as reflected in failed

attempt to participate in IRS voluntary disclosure program); *United States v. Milne*, 384 F. Supp.

2d 1309, 1311-12 (E.D. Wis. 2005) (imposing a sentence of five months where the guidelines

called for eighteen to twenty-four months based, in part, on defendant's decision to voluntarily

disclose his activity before he was charged). In fact, from a tax policy point of view, the

government should want to acknowledge attempts to get in the OVDI and the decision to plead

guilty.

Moreover, there is no evidence showing that recidivism is a concern. *See United States v.*

*Roth*, No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603, *3-4, 7 (N.D. Ill. Mar. 11, 2008)

(departing from guidelines range of 63 to 78 months to probation on charge of making materially

false statement to the FBI due, in part, to defendant's sincere remorse and absence of criminal history, all indicating no threat of recidivism). As detailed above, this case concerns an isolated event in Ty's otherwise law-abiding life, during which he has paid approximately $1 billion in taxes. There is no reason to believe prison time is necessary to prevent him from engaging in tax evasion again.

As to general deterrence, there have been thousands of media and Internet references to Ty's guilty plea which repeat his FBAR penalty and possible incarceration. No one could dispute that this case is the most publicized of the over 100 indicted offshore cases. The government has more than achieved its general deterrence goals in their selection of Ty for prosecution from the UBS 285 list. Finally, a term of incarceration is not required to provide Ty with "needed educational or vocational training, medical care, or other correctional treatment." In fact, as opposed to incarceration, as discussed below, a sentence of probation crafted with special conditions mandating Ty's contribution to particular charitable activities will actually yield a net positive societal benefit.

3.     **The Kinds of Sentences Available**

This Court has the authority and may exercise its discretion to consider a wide range of alternatives to the lengthy term of imprisonment that is called for under the Guidelines. 18 U.S.C. §§ 3553(a)(3), 3561(a)(1). In fact, § 3553(a)(3) specifically directs the judge to consider sentences *other than* imprisonment and the severity of a probationary sentence should not be underestimated. As the Supreme Court stated in *Gall*:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers do not enjoy the absolute

-23-

> liberty to which ever citizen is entitled.') (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

552 U.S. at 48 (footnote omitted).

### a.      A Sentence of Probation with Home Confinement Is Appropriate.

The Court may also consider a sentence of probation with a period of home detention, which has been defined by the Guidelines as:

> [A] program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, education or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are as effective as electronic monitoring.

U.S.S.G. § 5F1.2 (Commentary).

As reflected in the PSR, 18 U.S.C. § 3561(c)(1) authorizes a sentence of probation with special conditions in this case. (PSR ¶ 85.) On a number of occasions, federal district courts have sentenced defendants to probation (often including a period of home confinement) where: (1) the defendant engaged in exactly the same conduct as Ty; or (2) the defendant exhibited traits and circumstances under the § 3553(a) analysis meriting sentencing leniency. As to the first point, dozens of individuals who engaged in the exact same conduct with respect to undisclosed

overseas bank accounts have been sentenced to probation within the last five years. A number of specific examples are set forth below in Section 6 as part of the analysis of the need to avoid unwarranted sentencing disparities.

Second, a number of defendants have received sentences of probation after demonstrating characteristics and circumstances similar to a number of those present in this case. *E.g.*, *Howe*, 543 F.3d at 130-31 (affirming below guideline sentence of probation and home confinement on wire fraud convictions); *United States v. Moore*, 344 Fed. Appx. 767, 768-69 (3d Cir. 2009) (affirming sentence of probation and home detention on tax evasion conviction despite guideline range of 18 to 24 months based on defendant's lack of criminal history and cooperation with the government); *Anderson*, 267 Fed. Appx. at 849-50 (affirming sentence of home confinement despite guideline range of 18 to 24 months based on defendant's lack of knowledge of the law at issue and defendant's prompt and complete efforts to provide restitution through a civil agreement with the SEC). These cases are merely illustrative of many others that have imposed sentences of probation with home confinement, including for the same crime to which Ty has pleaded guilty to, as detailed further below in Section 6.

### b. Support for Community Service Sanctions

Based upon the information contained in this memorandum, and given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community service order would satisfy the goals of sentencing. A 2005 publication of the Administrative Office of the U.S. Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service,* Office of

Probation and Pretrial Services, Administrative Office of the U.S. Court (2005). It is recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.* In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.

*Id.*

In April 2010, the United States Sentencing Commission submitted to Congress proposed amendments, which went into effect November 1, 2010. One of the results of those amendments was to increase a judge's ability to impose sentences that include alternatives to incarceration. In its official submission to Congress, the Sentencing Commission explained:

> The amendment is a result of the Commission's continued multi-year study of alternatives to incarceration. The Commission initiated this study in recognition of increased interest in alternatives to incarceration by all three branches of government and renewed public debate about the size of the federal prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders.

*Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary* at 2-3 (April 30, 2010).

Ty is an outstanding candidate for community service. He is a first-time offender, he has no history of violence, and he is highly motivated to continue aiding his community as is evident

from his past efforts on behalf of charitable concerns. Rigorous and appropriately structured community service will serve the needs of justice very effectively in this case, by taking his time and expertise and putting them to use in a constructive and useful manner.

For many reasons, the Court should sentence Ty to a period of probation conditioned upon substantial community service. This sentence represents the best use of his talent and work ethic to benefit organizations such as the Chicago public schools. As examples, two specific schools are identified that could greatly benefit from his personal involvement.

The first school is the Ellen H. Richards Career Academy High School located in the Back of the Yards neighborhood on the southwest side of Chicago. It is an urban high school with an enrollment of over 500 students that is career-oriented. The second school is the Edward Tilden Career Community Academy High School, located on South Union Avenue in Chicago. It is also a career-oriented high school. Ty could design, teach, and mentor students in a curriculum tailored to producing a retail product that could be used as a fundraiser for the school. He would be responsible for organizing a curriculum that would focus on manufacturing and selling a product such as a school mascot that could be modeled after his Beanie Baby success story.

Ty's background and experience in giving back to the community and helping others can make an enormous contribution to the Chicago community. His commitment to helping young people, backed by experience, is an asset that schools could not otherwise afford within their budgetary constraints. There is little doubt that Ty can be of significant benefit to the Chicago community. Community service can serve as a significant sanction. In a major fraud case in the Eastern District of New York, Judge John Gleeson eloquently spoke to the value of community service:

The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.

\*\*\*\*\*\*

In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.

Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.

Sentencing Transcript from *United States of America v. Shamilzadeh,* 04-CR-194

(JG), E.D.N.Y. (2008).

4.      **The Sentencing Guidelines**

Ty has already acknowledged that the PSR correctly calculates the guideline range

applicable to his case.  Additional comments on the guidelines are included in the discussion of

sentencing disparity below.

5.      **Pertinent Policy Statements.**

There are no pertinent U.S. Sentencing Commission policy statements.

6.      **The Need to Avoid Unwarranted Disparities Among Similar Offenders**

Ty's case is part of an aggressive five-year IRS/DOJ program to pursue tax offenders

who have used offshore accounts to conceal funds.  More than 100 individuals have been

charged as a part of that program and approximately 47 have been sentenced as of the date of this

memorandum.  These cases have invariably involved significant tax loss and foreign accounts

averaging approximately $7 million, but going as high as $200 million.  By far, the most

common sentence, in 63% of the cases, has been probation, in many instances with a

combination of home confinement and/or community service.  It is entirely appropriate for the

Court to look to sentencing in similar cases and to note when those cases have consistently

imposed sentences below the guidelines' suggestion including sentences of probation.  *United*

*States v. Groos*, No. 06 CR 420, 2008 U.S. Dist. LEXIS 103705, *19-20, 31-32 (N.D. Ill. Dec.

16, 2008) (looking at other cases and sentencing defendant to 60 days imprisonment despite

guideline range of 24 to 30 months).

A chart is attached as Exhibit 1 providing detailed information on the 47 cases sentenced

so far in this government offshore enforcement effort.[4]  The chart summarizing sentences

---

[4] This chart was created based on a review of Justice Department press releases, media reports, and public
websites tracking offshore prosecutions and results.  The chart does not include sentences of promoters or enablers,
such as foreign bank officials.

imposed on other individuals is stark and compelling. Important facts from this analysis of dozens of sentences by federal judges across the country include:

- At least eight individuals who attempted to enter the OVDI but were rejected as being on the list of 285 individuals identified by UBS (Upham, Moran, Curran, Eisenberg, Robbins, Quintero, Zabczuk, and Chernick) received sentences of probation or less than 6 months.

- Looking more broadly at all defendants, including the vast majority who did not attempt to enter the OVDI, 78% received a sentence of probation or incarceration time of 6 months or less.

- Similarly, 63% of all defendants received no period of incarceration.

In these offshore cases, the courts have and are repeatedly granting significant variances from the guideline range. One significant consideration for the courts is the defendant's efforts to make a voluntary disclosure.

Also, it is significant to consider, before looking at disparity among those actually charged in the overseas cases, that tens of thousands of identically situated individuals have avoided prosecution altogether based on their acceptance into one of the repeated OVDI programs. In an analogous situation, the Seventh Circuit considered the inequities that resulted from the adoption, in several districts, of so-called "fast track" prosecutions. *United States v. Reyes-Hernandez*, 624 F.3d 405, 409-10 (7th Cir. 2010). Under such programs, defendants in particular judicial districts were able to engage in expedited charge bargaining that quickly resolved cases for the government in return for more lenient sentences; however, the fast track program was not available for similarly situated defendants in other districts. *Id.* Despite the unavailability of a fast track program to the defendant in *Reyes-Hernandez*, the Seventh Circuit concluded that the district court could note and consider the disparity and inequities among different districts as part of its § 3553(a)(6) analysis. *Id.* at 420; *see also Suarez-Reyes*, 2012 U.S. Dist. LEXIS 178771 at *19-20 (sentencing defendant guilty of check kiting far below

-30-

guidelines while noting "that many similar offenders escape prosecution altogether, or are subject only to civil penalties").

The government will no doubt point to the concededly large size of Ty's account as a reason for the court to impose some incarceration, but that ignores several mitigating factors that more than compensate for this fact. These include, as noted above, his effort to join the IRS program, which does not consider account size (and which did not occur in the majority of the sentenced cases), and his significant commitment to charitable causes. In addition, although a tax loss in excess of $5 million is large, the Court should consider Ty's payment of approximately $1 billion in taxes in his lifetime. Moreover, Ty's tax loss would have been even smaller had he not exhausted the charitable contribution threshold in several years. Again, these facts do not minimize a $5 million tax loss, but they provide perspective relative to the other tax law violators who have been sentenced to probation.

The most dramatic example in this regard (included in the attached chart) was the prosecution of Mary Estelle Curran in the Southern District of Florida. Ms. Curran was prosecuted for an undisclosed Swiss bank account of over $47 million, and like Ty paid a 50% FBAR penalty of $21 million prior to sentencing. The court focused on Ms. Curran's efforts to enter the IRS disclosure program and the government's rejection of her application because her name appeared on the UBS 285 list in February 2009. The court stated that the case was "unfortunate and it seems to me the government should have used a little more discretion in handling this." The court queried the defense as to whether they had pressed the government to dismiss the case and "settle for the 21 million [she did] pay." The court then sentenced Ms. Curran to *five (5) seconds of probation*. Thereafter, the court noted that Ms. Curran was an excellent candidate for a Presidential pardon and noted that if the government declined to join

-31-

that application, it would be "spiteful."  In the Curran case, the court appeared to give great

weight to the fact that Ms. Curran's conduct was virtually identical to that of taxpayers obtaining

OVDI treatment.

The Curran sentence is not an outlier, and in fact reflects/represents the majority of

sentences in the offshore cases prosecuted in the government's five-year enforcement effort.  For

example:

- Igor Olenicoff, Central District of California, Case No. 07-CR-227.  Controlled and hid assets in undisclosed foreign accounts resulting in tax liability to the IRS totaling $52 million.  His offshore accounts contained approximately *$200 million*.[5]  Sentenced to two years' probation.

- Steven Rubinstein, Southern District of Florida, Case No. 09-CR-60166.  Hid approximately $7 million in undisclosed UBS accounts he used to purchase real estate and South African Kruggerands.  Sentenced to 3 years' probation, 12 months' home detention.

- John McCarthy, Central District of California, Case No. 09-CR-784.  Transferred over $1 million to an undisclosed UBS account and regularly communicated with UBS representatives to authorize transactions.  Sentenced to 3 years' probation, 6 months' home detention, 300 hours of community service.

- Juergen Homann, District of New Jersey, Case No. 09-CR-724.  Control of a UBS account of $5 million and made a conscious decision not to seek out and enter into the IRS' voluntary disclosure program.  Sentenced to 5 years' probation, 300 hours of community service.

- Paul Zabczuk, Southern District of Florida, Case No. 10-CR-60112.  Directed his foreign clients to make payments to his company through offshore accounts he controlled in the Bahamas and Switzerland and further funded those offshore accounts through other payments.  Unsuccessfully attempted to enter the voluntary disclosure program.  Sentenced to 3 years' probation, 12 months' home detention, 150 hours of community service.

---

[5] Paragraph 15 of the PSR states Agent Lawson's belief that the Warner case involves the highest offshore bank account.  In fact, as indicated the Olenicoff case involved an accounts approaching $200 million.  Moreover, counsel for the defense is aware of cases accepted within the offshore program in excess of $100 million and one in excess of $240 million.  It should be noted that account size, tax loss, use of the funds, and similar factors have never been a basis to exclude a taxpayer from the disclosure program.  The only disqualifying circumstances are illegal income or untimely disclosure.

- Jules Robbins, Southern District of New York, Case No. 10-CR-333. Created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts containing nearly $42 million. Sentenced to 12 months' probation.

- Ernest Vogliano, Southern District of New York, Case No. 10-CR-00327. Opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations. Actively used funds and transferred some after learning of the criminal investigation. Sentenced to 2 years' probation.

- Leonid Zaltsberg, District of New Jersey, Case No. 10-CR-437. Transferred his UBS accounts to a nominee Panamanian corporation for the purpose of hiding them from the IRS and, as found by the District Court at sentencing, "made a conscious and calculated decision to hide money offshore." Sentenced to 4 years' probation, 12 months' home detention.

- Jeffrey Chatfield, charged in the United States District Court for the Southern District of California, Case No. 10-CR-4546. Held UBS account in the name of a nominee entity. Sentenced to 3 years' probation.

- Andrew Silva, Eastern District of Virginia, Case No. 10-CR-00044. Repatriated funds from his undisclosed offshore account by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000. Sentenced to 2 years' probation, 4 months' home detention, 100 hours of community service.

**7.     The Need to Provide Restitution to Any Victims of the Offense**

Ty will pay restitution to the only victim in this case, the United States Treasury, by the date of sentencing. In addition to back tax returns and interest, which will be filed and paid prior to sentencing, the defendant will also have paid the $53 million FBAR penalty agreed to in the plea agreement with the government. Combined, the FBAR penalty and the back tax payments equal over 65% of the entire bank balance in Switzerland prior to the time Ty began both reporting and paying taxes on that account. In light of Ty's tax and FBAR penalty payments, the defense respectfully suggests that no additional restitution order is required at sentencing.

## CONCLUSION

**A SENTENCE OF PROBATION WITH SPECIAL CONDITIONS IS APPROPRIATE.**

As the Court considers what constitutes a reasonable sentence pursuant to § 3553(a), it should keep in mind the Supreme Court's admonition that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (internal quotations omitted). Courts have consistently considered departing downward when a defendant voluntarily disclosed or self-reported his criminal actions. *See, e.g.*, *Tenzer*, 213 F.3d at 43-44; *Milne*, 384 F. Supp. 2d at 1311-12. This fact is clearly reflected in a number of the overseas cases account cases from the last five years detailed above (Upham, Moran, Curran, Eisenberg, Robbins, Quintero, Zabczuk, and Chernick). In *Koon v. United States*, 518 U.S. 81, 113 (1996), the Supreme Court observed, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Ty is paying dearly for his mistakes and will continue to do so for the rest of his life. He does not seek to diminish the gravity of his conduct, but he respectfully asks the Court to consider all of the facts detailed in this brief. The following facts provide a basis for variance in this case: (i) Ty's extraordinary acceptance of responsibility through unprompted early efforts to disclose and correct his misconduct and the payment of penalties well in excess of any tax gain to him; (ii) an evaluation of current sentencing practices in similar (or more egregious) cases; (iii) Ty's significant support of charitable activities prior to this case; and (iv) the positive impact on the community from a sentence of probation with the special conditions that allow him to continue to serve charitable causes.

A sentence of probation conditioned upon a substantial community service order would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Ty. Here, the significant mitigating factors relating to Ty's offense and his personal, professional, and community background provide compelling support for a non-incarceration sentence.

Based upon the information contained in this memorandum, Ty Warner respectfully asks the Court to sentence him to a term of probation conditioned upon community service. Accordingly, the Court should impose a sentence of probation, supplemented with special conditions appropriate to his crime and that would assist the community.

|  |  |
|---|---|
| | Respectfully submitted, |
| December 31, 2013 | /s/ Gregory J. Scandaglia |
| | |
| | Gregory J. Scandaglia (#6195144) |
| | Michael S. Shapiro (#6279776) |
| | Scandaglia & Ryan |
| | 55 East Monroe, Suite 3440 |
| | Chicago, IL 60603 |
| | Telephone: (312) 580-2020 |
| | Facsimile: (312) 782-3806 |
| | |
| | Michael J. Garcia |
| | Kirkland & Ellis LLP |
| | 601 Lexington Ave. |
| | New York, NY 10022 |
| | Telephone: (212) 446-4800 |
| | Facsimile: (212) 446-6460 |
| | |
| | Mark E. Matthews |
| | Caplin & Drysdale |
| | One Thomas Circle N.W. |
| | Suite 1100 |
| | Washington D. C. 20005 |
| | Telephone: (202) 862-5000 |
| | Facsimile: (202) 429-3301 |

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on December 31, 2013, a copy of the foregoing Defendant's Sentencing Memorandum in Support of a Sentence of Probation with Special Conditions was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                              /s/ Gregory J. Scandaglia