UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 731 |
| | ) | |
| vs. | ) | Honorable Charles P. Kocoras |
| | ) | |
| H. TY WARNER | ) | |

### Government's Sentencing Memorandum

The UNITED STATES of AMERICA, through its attorney, ZACHARY T. FARDON, respectfully submits the following position paper as to sentencing factors, and asks this Court to impose a sentence of a term of incarceration.

## I. CORRECTION TO PRESENTENCE INVESTIGATION REPORT

The government has no objection to the PSR. The government notes one agreed correction to the PSR: the list of defendant's assets in Paragraph 75 fails to include a Swiss bank account held by defendant at Neue Privat Bank AG ("NPB"). The NPB account contains the now-disclosed funds that were previously held at UBS AG and then ZKB.

Paragraph 75 of the PSR should be amended to include the NPB account, which contained approximately $121,000,000 at the time the PSR was drafted. Defense counsel indicated to the government that the exclusion of the NPB account from the PSR was inadvertent, and further represented

that the funds in the NPB account were used to pay the agreed FBAR penalty and will be used to pay any tax due and owing in this case.

## II.    BACKGROUND

On October 2, 2013, defendant pleaded guilty to one count of tax evasion for tax year 2002, in violation of Title 26, United States Code, Section 7201.  Doc. 15.

As part of the plea agreement, defendant admitted that between January 1996 and 2008, he opened and maintained undeclared bank accounts in Switzerland at both UBS AG and Zuercher Kantonalbank ("ZKB").  Doc. 15 at 2.

Defendant further admitted that he failed to report the income from his accounts at UBS AG and ZKB, as well as the existence of those accounts, on his individual income tax returns, Forms 1040, and amended tax returns, Forms 1040X, for tax years 1996 through 2007.  *Id*. at 5-6.

Additionally, defendant admitted that he failed to report his financial interest in the accounts at UBS AG and ZKB each year from 1996 to 2008 to the Department of the Treasury, as required on the Report of Foreign Bank and Financial Accounts ("FBAR"), Form 114.[1]

---

[1] During the relevant tax years, the FBAR Form was identified as "Form TD F 90-22.1," and became "Form 114" for the 2014 filing year.  An FBAR must be filed each year by a

2

## Offshore Accounts Maintained by Defendant

In January 1996, defendant traveled to Zurich, Switzerland, to open an undeclared account at UBS AG.  Doc. 15 at 3; Exhibit A.  On the same date, defendant executed a "hold mail" form, instructing that any correspondence regarding his UBS AG account be maintained at the bank in Switzerland rather than mailed to the defendant in the United States.  Doc. 15 at 3; Exhibit B.

Defendant has not identified the source of the funds in the UBS AG account or the purpose behind the secret account, other than to suggest the opening of the account was based on the success of Beanie Babies sales.  Doc. 24 at 11.  The records provided from UBS AG do not show how the account was funded.  Therefore, it is presently unknown whether or not the initial deposits into the UBS AG account were pre-tax funds.[2]

From January 1996 through 2002, defendant maintained the undeclared account at UBS AG.  Doc. 15 at 4-5.  During that time period, defendant did not report the existence of, or income earned from, the account

United States taxpayer who has financial interest in, or signature authority over, foreign financial accounts if the aggregate value of the foreign account is over $10,000 at any time during the calendar year.  31 C.F.R. §§ 103.24, 103.27, and 103.32.  The FBAR is filed directly with the Department of the Treasury, and is due by the June 30th of the following year.

[2] If the funds used to open the account were diverted pre-tax, the tax loss calculation would rise significantly.

at UBS AG on the Schedule B of his Forms 1040 each year.[3]  Doc. 15 at 3.

Additionally, defendant failed to report the UBS AG account each year, as

required, on an FBAR filed with the Department of the Treasury.

Effective January 1, 2001, UBS AG signed a Qualified Intermediary

Agreement with the Internal Revenue Service ("IRS"), in which UBS AG

agreed to report certain tax information and withhold and pay over taxes to

the IRS with respect to account holders who held United States securities.

*See United States v. UBS AG*, 09-CR-60033 (S.D. FL), Doc. 20.  During this

time period, Hansreudi Schumacher was one of the UBS AG bankers

servicing defendant's account.  Hansreudi Schumacher was indicted in 2008

for conspiring to defraud the United States, and remains a fugitive.  *United*

*States v. Hansreudi Schumacher et al.,* 09-CR-60210 (S.D. Fl.), Doc 1.

According to the indictment, Schumacher left employment at UBS AG in mid-

2002 to become an independent asset manager.  *Id.* at 2.  The indictment also

alleges that after Schumacher left UBS AG, he counseled some of his former

UBS AG clients to move their undeclared accounts to ZKB because it was

"beyond the reach of the United States Government" because it "had no

---

[3] Schedule B, Part III, asks a taxpayer to answer "yes" or "no" to the following question: "At any time during [the tax year], did you have an interest in or signature or other authority over a financial account in a foreign county, such as a bank account . . . ?"  For each year, defendant answered "No."

4

Qualified Intermediary Agreement with the IRS and no presence in the United States." *Id*. at 9.

In December of 2002, defendant traveled to Zurich, Switzerland, and directed UBS AG to close his account and transfer his funds to ZKB. Doc. 15 at 3. Two letters were provided to UBS AG on behalf of the defendant. The first letter instructed UBS AG to "transfer all assets to Zuercher Kantonalbank," to send all correspondence to Hansruedi Schumacher, and "[a]fter transfer, please close all accounts." Exhibit C. The second letter to UBS stated the following:

> I hereby specifically instruct you not to call, not to visit, not to engage in any sort of communication with me re transfer. Non-compliance will have consequences. I kindly ask you to transfer all assets within 5 days after receipt of this letter.

Exhibit D. Both letters have the following handwritten notation:

> Client/instructions identified/confirmed upon a personal meeting with the client and [UBS employees] Martin Liechti, Michel Guignard and Peter Brand on 20.12.02/12.00

Exhibits C, D.

In either late 2002 or early 2003, the amount of funds in the UBS AG account in the amount of approximately $93,630,083 was transferred to ZKB. Doc. 15 at 4. Defendant's new account at ZKB was managed by Hansreudi Schumacher. Exhibits C, D.

5

Defendant opened the account at ZKB, not in his own name, but instead in the name of a purported Liechtenstein foundation, the "Molani Foundation." Doc. 15 at 4. The effect of placing the account in the name of the foundation was to conceal defendant's identity as the account holder, as his name was not listed on the account. Doc. 15 at 4. Defendant has never explained his decision to conceal his accounts at UBS AG and ZKB.

From 2002 until tax year 2007, defendant did not report the existence of, or income earned from, the account at ZKB on the Schedule B of his Forms 1040 each year. Doc. 15 at 3. Additionally, in December of 2007, defendant filed amended tax returns for tax years 2002, 2003, 2004, and 2005. Defendant's amended returns again failed to report the foreign accounts and related income.

In early May of 2008, UBS AG publicly disclosed that it was under investigation by the Department of Justice and the Securities and Exchange Commission for assisting United States customers in evading income taxes from 2000 to 2007.[4] On May 8, 2008, it was reported that a top-ranking UBS AG executive was detained by federal authorities in the United States in

---

[4] *See, e.g.*, Werdigier, Julia, "UBS to Lay Off 5,500 in U.S. and Britain," *New York Times*, May 7, 2008, Page C6.

6

connection with the tax investigation.[5]  On May 14, 2008, it was announced that former UBS AG banker Bradley Birkenfeld was indicted for conspiring to assist a United States taxpayer in evading taxes using an undeclared account at UBS AG.[6]

On October 13, 2008, defendant signed and filed his 2007 individual income tax return, Form 1040.  Despite the well-publicized UBS AG investigation, defendant continued his tax evasion by failing to report any income from the ZKB account, and falsely stating that he had no interest in a foreign financial account on his Schedule B.

In 2009, the investigation of UBS AG, its employees, and its United States clients intensified, and both former employees and former customers were indicted.  Despite all the publicity, defendant did not attempt to disclose his account at ZKB until late 2009, after he learned that UBS AG was going to disclose client records and that Hansreudi Schumacher, his asset manager, had been indicted.

---

[5] *See, e.g.*, Browning, Lynnley, "U.S. Detains Executive, Deepening UBS Inquiry," *New York Times*, May 8, 2008, Page C3.

[6] *See, e.g.*, Browning, Lynnley, "Ex-Banker From UBS is Indicted in Tax Case," *New York Times*, May 14, 2008, Page C3; *see also United States v. Bradley Birkenfeld*, 08-CR-60099 (S.D. FL), Docs. 1, 13 (unsealing the indictment on May 13, 2008 following the arrest of Birkenfeld).

## UBS AG Deferred Prosecution Agreement

On February 18, 2009, UBS AG entered a deferred prosecution agreement with the Department of Justice. *United States v. UBS AG*, 09-CR-60033 (S.D. FL), Doc. 20. In the agreement, UBS AG agreed that it participated in a scheme to defraud the United States from 2000 through 2007 by actively assisting United States taxpayers in concealing their ownership or beneficial interest in accounts at UBS AG. Doc. 20 at 2. As part of the settlement agreement, UBS AG agreed to provide the identities of undeclared account holders, along with account statements, for a number of United States clients. Doc. 20 at 6.

## Voluntary Disclosure Program

On March 26, 2009[7], the IRS announced the Offshore Voluntary Disclosure Initiative ("OVDI") program, which allowed taxpayers with previously undisclosed offshore bank accounts to come forward and voluntarily disclose those accounts to the IRS. The creation of the OVDI program was extensively covered in the media, including in the *New York*

---

[7] See "Statement from IRS Commissioner Doug Schulman on Offshore Income," dated March 26, 2009, at *http://www.irs.gov/uac/Statement-from-IRS-Commissioner-Doug-Shulman-on-Offshore-Income.*

*Times* and *Wall Street Journal*.[8]  The original deadline for taxpayers to enter the OVDI program was September 23, 2009.

Taxpayers whose undisclosed accounts were already known to the United States government were not eligible for the voluntary disclosure program.  For those individuals accepted into the program, the taxpayer had to provide a variety of information to the IRS, including: 1) the source of the funds in the account(s); 2) the purpose for setting up the account(s); and 3) an explanation of all face-to-face meetings and communications that taxpayers had with foreign bankers or independent asset managers regarding the foreign account(s).

### Information and Plea of Jeffrey Chernick

On July 13, 2009, a one-count information was filed in the Southern District of Florida, charging toy manufacturer and Schumacher client Jeffrey Chernick with one count of filing a false tax return in violation of Title 26, United States Code, Section 7206(2).  *United States v. Jeffrey Chernick*, 09-CR-60182 (S.D. FL), Doc. 1.  On July 28, 2009, Chernick pleaded guilty pursuant to a written plea agreement.  Doc. 16.  According to the plea

---

[8] *See, e.g.*, Lynnley Browning, "The I.R.S. Will Lower Penalties for Some Offshore Tax Evaders," *New York Times*, March 27, 2009, Page B3; Kevin McCoy, "IRS: Offshore Account? Tell Us Now, Reduced Penalties Apply, But Only for Six Months," *USA Today*, March 27, 2009, Money Section; Evan Perez and Tom Herman, "IRS Cuts Penalties to Lure Tax Evaders," *Wall Street Journal*, March 27, 2009, Page A3.

agreement and agreed statement of the facts, Chernick opened and maintained undeclared accounts at UBS AG with a maximum account balance of approximately $8 million. Docs. 16, 17. Chernick further admitted he used the UBS AG account to conceal commissions paid to Chernick by Chinese and Hong Kong toy manufacturers, as Chernick directed those manufactures to pay him via the undeclared UBS AG accounts. Doc. 17.

Chernick admitted that he was assisted in the concealment of his income and offshore account by Hansreudi Schumacher. Doc. 23. Because of his cooperation against Schumacher and others, the Government filed a motion for a 50% reduction of the Guidelines range of 18 to 24 months' imprisonment, pursuant to U.S.S.G. § 5K1.1, and Chernick was sentenced in October of 2009 to three months' incarceration followed by a year of supervised release. Docs. 23, 27.

### Indictment of Hansreudi Schumacher

On August 29, 2009, Hansreudi Schumacher, defendant's asset manager, was indicted in the Southern District of Florida on one count of conspiring to defraud the United States in violation of Title 18, United States Code, Section 371. *United States v. Hansreudi Schumacher et al.,* 09-CR-

60210 (S.D. Fl.), Doc 1. The indictment alleges that Schumacher assisted United States customers in opening and maintaining undeclared accounts at UBS AG and other banks, and assisted those customers in concealing their accounts and income by helping the customers set up sham nominee offshore entities. *Id.* Schumacher remains a fugitive.

## Defendant's Attempted Voluntary Disclosure

On September 18, 2009, after the UBS AG deferred prosecution agreement, the indictment of Bradley Birkenfeld, the plea of fellow Schumacher client (and toy manufacturer) Jeffrey Chernick, and the indictment of Hansreudi Schumacher were made public, defendant sent the IRS a letter requesting eligibility for the voluntary disclosure program. PSR ¶ 13. Defendant admits that he knew both of the UBS AG investigation and of the Schumacher indictment prior to his decision to make a voluntary disclosure. Doc. 24 at 12.

Defendant's letter was sent after the United States government was already aware of defendant's undeclared account at UBS AG, and accordingly, defendant was not eligible to enter the voluntary disclosure program. PSR ¶ 13. The government first obtained information that

defendant had an undisclosed account at UBS AG in the summer of 2008, and later obtained account records from UBS AG.[9]

## Unreported Income

Defendant admitted that the amount of unreported income for tax years 1999-2008 was $24,448,912. Doc. 15 at 6. The following chart shows the amount of unreported gross income each year:

| Tax Year | Unreported Gross Income |
|----------|------------------------|
| 1996 | Unknown |
| 1997 | Unknown |
| 1998 | Unknown |
| 1999 | $2,685,935 |
| 2000 | $4,906,574 |
| 2001 | $4,396,919 |
| 2002 | $3,275,889 |
| 2003 | $1,370,447 |
| 2004 | $621,154 |
| 2005 | $86,369 |
| 2006 | $3,256,731 |
| 2007 | $3,848,894 |
| 2008 | $0 |
| **TOTAL** | **$24,448,912** |

---

[9] Defendant speculates that his account records were part of 285 UBS AG accounts disclosed to the government in 2009. The list of account holders that were disclosed by UBS AG is not a matter of public record. Additionally, the criteria setting forth which account holders were disclosed by UBS AG as part of the deferred prosecution agreement remains sealed pursuant to court orders in the Southern District of Florida. *United States v. UBS AG*, 09-CR-60033 (S.D. FL), Doc. 20 at 6. But to be clear, the government first learned of defendant's account in 2008. Defendant's effort to disclose his account in 2009 came too late, and as explained in detail in this memo, his efforts to date fall well short of the kind of disclosure that meaningfully mitigates the seriousness of his offense.

12

The above chart is incomplete because UBS AG provided few records relating to defendant's account to the United States for the time period prior to 1999, so there are no records reflecting the gross income from the UBS AG account for those years.[10]

## III.   GUIDELINES CALCULATION

Although the Guidelines are advisory, the Supreme Court has stressed that the district court must treat them as "the starting point and initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). As such, the district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *Id.*

The parties agree on the Guidelines calculation as set forth in the plea agreement[11]:

---

[10] The above chart also lists no tax loss for 2008. Defendant's 2008 tax return declares the existence of the account at ZKB and reports $723,203 of income from the ZKB account. However, the return underreports the income from the ZKB account by more than two million dollars; because this underreporting may have been inadvertent, the unreported income and any tax loss from such income are not included in the tax loss calculations. It is the government's understanding that defendant intends to amend the 2008 return prior to sentencing, however, to the best of the government's knowledge the return has not yet been amended.

[11] The plea agreement contains agreed Guidelines calculations based on the Guidelines Manual in effect at the time of the plea, which was the 2012 Guidelines Manual. Doc. 15 at

## A. Base Offense Level

Pursuant to U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(J), the base offense level is 24, as the total amount of tax loss from the charged offense and relevant conduct, $5,594,877, is more than $2,500,000 but not more than $7,000,000.

The tax loss was computed as follows:

| Year | Additional Gross Income | Charitable Deductions | Bank Charges, Etc. | Additional Net Income | Tax Rate | Tax Loss |
|---|---|---|---|---|---|---|
| 1999 | $2,685,935 | | ($149,273) | $2,536,662 | x 28% = | $710,265 |
| 2000 | $4,906,574 | | ($201,567) | $4,705,007 | x 28% = | $1,317,402 |
| 2001 | $4,369,919 | | ($95,695) | $4,301,224 | x 28% = | $1,204,343 |
| 2002 | $3,275,889 | | ($114,101) | $3,161,788 | x 28% = | $885,301 |
| 2003 | $1,370,447 | | ($36) | $1,370,447 | x 28% = | $383,725 |
| 2004 | $621,154 | ($310,577) | | $310,577 | x 28% = | $86,962 |
| 2005 | $86,369 | ($43,185) | | $43,184 | x 28% = | $12,092 |
| 2006 | $3,256,731 | ($1,628,366) | | $1,628,365 | x 28% = | $455,942 |
| 2007 | $3,848,894 | ($1,924,447) | | $1,924,447 | x 28% = | $538,845 |
| **TOTAL TAX LOSS** | | | | | | **$5,594,877** |

Any identifiable bank charges, management fees, or other account-related fees paid by the defendant related to his offshore bank accounts were deducted from the total income each year.

Additionally, in years which defendant had reported charitable contributions that he was unable to deduct due to a net operating loss, the defendant was given credit for a 50% reduction based on charitable

---

7. At the time of sentencing, the 2013 Guidelines Manual is in effect, however, the Guidelines calculation is identical under either the 2012 or 2013 Guidelines Manuals.

14

contributions. Generally, deductions for charitable contributions are capped at 50% of gross income for a given year. *See* 26 U.S.C. § 170(b)(1)(A). To be conservative, the government provided a deduction for the maximum amount of charitable deductions of 50% of the income from the offshore bank accounts each year from 2004-2007, even though defendant may not have actually been able to claim such deductions because a net operating loss negated all gross income against which charitable contributions could be deducted.

Additionally, the above tax loss does not include any tax loss for tax years 1996-1998 because UBS AG did not provide sufficient records to determine what, if any, income was earned by defendant's account during those years.

### B.    Adjustments

An additional 2-level enhancement is added under U.S.S.G. § 2T1.1(b)(2) for sophisticated means.

Defendant agreed to plead guilty pre-indictment and, due to his timely acceptance of responsibility, his offense level is decreased 3 levels under U.S.S.G. § 3E1.1(a) and (b).

Accordingly, the offense level is 23, which combined with a criminal history category of I, results in an advisory sentencing range of 46-57 months' imprisonment.

## IV.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The framework for determining an appropriate sentence is set forth in 18 U.S.C. § 3553(a), which requires that the Court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstance of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentencing disparities.

Considering these factors, along with the advisory Sentencing Guidelines, the government recommends a sentence which includes a term of imprisonment.  Each of these factors is discussed in greater detail below:

### A.   NATURE AND CIRCUMSTANCE OF THE OFFENSE

The defendant's failure to report his Swiss bank accounts, and related income from those accounts, is a serious offense.  For each year from 1996 through 2007 – twelve returns in total, plus an additional four false amended

16

returns – defendant signed and filed false tax returns, which failed to disclose the accounts and the income earned from the accounts. This was not a one-time offense, rather, it was a continuing course of conduct designed to conceal the accounts and related interest year after year. There are many points at which defendant could have chosen to declare his income but failed to do so, including: in 1996 when he opened the account, in 2002 when he traveled to Zurich to move his account to ZKB, in 2007 when he amended his 2002 - 2005 returns, or in the spring of 2008 when the media reported that UBS AG was under investigation for assisting United States customers in evading taxes.

Additionally, this is a crime committed not out of necessity, but greed, as defendant was earning millions of dollars each of the years of his tax evasion scheme. For example, in 1999 alone, defendant reported over $662 million in adjusted gross income on his tax return. Defendant currently reports that he has a net worth of over $1.7 billion. PSR ¶ 75. Defendant could comfortably afford to pay the approximately $5.5 million in taxes that he evaded, but he instead made a conscious effort year after year, for more than a decade, to file false tax returns underreporting his income. The long-term, repetitive nature of Warner's tax offenses, coupled with the sizeable tax loss, are aggravating factors.

17

Since Warner has chosen not to explain to the Court his reasons for creating a Swiss concealment apparatus for his tax fraud scheme, the motive for his crime remains unknown. Either he dodged more than $5,000,000 in taxes out of greed, or he had some reason to hide the source of the moneys which funded his Swiss accounts.

In any event, "[t]ax offenses, in and of themselves, are serious offenses; however, a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one with otherwise similar characteristics." U.S.S.G. § 2T1.1, comment. (backg'd). In this case, the tax loss of $5,594,877 is substantial.

In the United States, the tax system relies on voluntary compliance – that is, individuals correctly reporting to the IRS their true income earned and tax due and owing. A recent IRS study estimates that only 83.1% of individuals are compliant, leaving a yearly tax gap of over $385 billion dollars in unreported and uncollected taxes.[12]

The detection of undeclared income can be a difficult and time-consuming process for the Internal Revenue Service. Tax evasion using

---

[12] "IRS Releases New Tax Gap Estimates; Compliance Rates Remain Statistically Unchanged from Previous Study," Jan. 6, 2012, *available at* http://www.irs.gov/uac/IRS-Releases-New-Tax-Gap-Estimates;-Compliance-Rates-Remain-Statistically-Unchanged-From-Previous-Study.

offshore assets is particularly difficult for the United States to detect and investigate, as other countries do not have the same type of tax reporting requirements as do domestic banks and financial institutions. Indeed, in the case of countries like Switzerland, banking secrecy laws forbid banks from disclosing any information about an account holder except in narrow circumstances. Estimates of the value of lost tax revenue based on offshore individual income tax evasion range from $23 billion to $100 billion each year.[13] Clearly, tax evasion using offshore assets is a serious offense.

The time period between defendant's attempt to enter the voluntary disclosure in 2009 until the issuance of a grand jury subpoena in 2011 is also not a mitigating factor.[14] Criminal tax investigations are a time-intensive, lengthy process, made more difficult when the taxpayer uses hard-to-track foreign assets to conceal the evasion during a period of over a decade.

---

[13] Gravelle, Jane, "Tax Havens: International Tax Avoidance and Evasion," Congressional Research Service Report for Congress, Jan. 23, 2013, at 23-24, *available at* http://www.fas.org/sgp/crs/misc/R40623.pdf.

[14] Defendant makes reference to the Department of Justice Tax Division voluntary disclosure guidance, and an effort he made to comply with Tax Division practice. Doc. 24 at 14. However, the guidance cited by defendant only instructs that the Department of Justice "may consider," in determining whether or not prosecution is warranted, "along with all other factors," a defendant's voluntary disclosure "before any investigation of the person's conduct begins." *See* Criminal Tax Manual § 4.01, available at http://www.justice.gov/tax/readingroom/2008ctm/CTM%20Chapter%204.pdf. Because defendant did not disclose his conduct prior to the initiation of the investigation into his UBS AG account, § 4.01 is inapplicable.

19

Additionally, during this time period, defendant made no efforts to pay any of his outstanding tax obligation.[15]   The nature and circumstances of the case are the same now as they were in 2009.

## B.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

There is nothing in defendant's upbringing or background that excuse or justify, much less explain, his criminal conduct.   No personal or economic circumstances compelled defendant to commit the offense.    Defendant, although leading an otherwise law abiding existence, engaged in a decade-long scheme to evade his personal income taxes.

The defendant is a shrewd and successful businessman, who built Ty, Inc. from a small operation operated out of his condominium into a multi-billion dollar company.   Doc. 24 at 8-9.   Later, defendant diversified his holdings, and now owns and operates hotels, resorts, and golf courses.   PSR ¶ 74; Doc. 24 at 8-9.   Each year, defendant had the assistance of Certified Public Accountants who prepared his tax return.   Doc. 15 at 2.   Instead of using the expertise of those professionals to prepare accurate returns,

---

[15] In contrast, UBS AG customer Mary Estelle Curran filed amended tax returns and paid the estimated amount of all outstanding tax due and owing approximately one month after being rejected from the voluntary disclosure program in 2009; Curran pleaded guilty to two counts of filing a false tax return in 2012. *United States v. Mary Estelle Curran*, 12-CR-80206 (S.D. FL), Doc. 33 at 21-22.   Warner made no such efforts until 2014, after his guilty plea.

defendant admits that he concealed his Swiss bank accounts from those professionals.  Doc. 24 at 22.

As noted above, the defendant faced no financial difficulties during the twelve years he underreported his income, however in each of these years he made a conscious decision to conceal his Swiss accounts.  Defendant now claims he made a mere mistake and that his guilty plea represents a full acknowledgement of the remorse in his heart.  But Warner deserves little credit for admitting what he knows the government already had largely determined. Warner is telling the Court what he thinks he needs to say in order to appear to the Court to be open, honest, and ashamed. Unfortunately, the glaring omission of an honest explanation for the crime seems to be a continuation of his Swiss bank scheme: secretive and calculating.

## Defendants' Health

Defendant argues that his age and health support a probationary sentence.  Doc. 24 at 26.  In the PSR, defendant reported that his prostate cancer does not require treatment.   PSR ¶ 61.   Additionally, although defendant takes seven medications, most of the medications are for minor

ailments.  PSR ¶ 65.  There is nothing extraordinary about defendant's health that would justify a lesser sentence.

## Charitable Works

The defendant has submitted a number of letters to the Court regarding his character, and many of the letters specifically describe charitable acts by the defendant.  The government does not dispute that defendant has made significant charitable donations to a number of different worthy causes and he should be commended for his charity.  But given his means, defendant's charitable works are hardly exceptional.[16] *See United States v. Cooper*, 394 F.3d 172, 176-77 (3d Cir. 2005) ("more is expected of high-level business executives who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities."). Charity is not a "get-out-jail card." *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (holding that the sentencing court should have given weight to the defendant's wealth when evaluating his charitable contributions).

---

[16] Defendant asserts that he has given $140 million worth of charitable donations since 1995. Doc. 24 at 15.  On defendant's individual income tax returns from 1998 to 2011, defendant claimed only approximately $35.7 million in charitable deductions.  Defense counsel explained to the government that the $140 million figure includes the retail value of any Beanie Babies donated to charity, not the actual cost of those goods to defendant.

22

Moreover, as noted above, the defendant was given significant credit for charitable donations in the tax loss computations, as charitable donations also have a tax benefit to taxpayers.

## Defendant's Attempted Voluntary Disclosure

Defendant argues that his attempt to enter the voluntary disclosure program is a mitigating factor. Doc. 24 at 15-18. While a true voluntary disclosure prior to the government's discovery of the unlawful conduct can be a mitigating factor under § 3553(a), because the defendant did not make such a timely disclosure, his efforts are not mitigating.

The Guidelines Manual contains a policy statement on when a departure from the Guidelines may be warranted based on a voluntary disclosure:

> If the defendant voluntarily discloses to authority the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, *and if such offense was unlikely to have been discovered otherwise*, a downward departure may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that might otherwise would have remained undiscovered. *This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent. . . .*

U.S.S.G. § 5K2.16 (emphasis added). A downward departure for voluntary disclosure under § 5K2.16 is "specifically limited to disclosures made prior to

23

the discovery of an offense." *United States v. Roberts*, 313 F.3d 1050, 1055 (8th Cir. 2002); *see also United States v. Besler*, 86 F.3d 745, 747 (7th Cir. 1996) (explaining that a requirement for a downward departure is that the defendant must have disclosed the offense "prior to the discovery of the offense.")[17] As explained above, defendant's attempted voluntary disclosure was made after the United States became aware defendant had an undeclared account at UBS AG; his offense had already been discovered and his attempted disclosure was simply not timely and does not merit a reduction under U.S.S.G. § 5K2.16.

Defendant argues that his attempt to belatedly disclose his account is a mitigating factor under § 3553(a). While there is no evidence that defendant knew he was under criminal investigation at the time of disclosure, there certainly is evidence defendant was aware that disclosure of his account was probable. The investigation of UBS, the indictments of Jeffrey Chernick and

---

[17] The case cited by defendant, *United States v. Tenzer*, 213 F.3d 34, 41-44 (2d Cir. 2000) is not contrary to these holdings. Doc. 24 at 16. In *Tenzer*, the sentencing court indicated it could not consider a downward departure based on voluntary disclosure because of the appellate court's previous mandate in the case regarding the dismissal of the indictment based on defendant's attempts at voluntary disclosure. 213 F.3d at 41-42. The Court held that the district court was mistaken, as the law of the case did not bar the district court from taking an attempted voluntary disclosure into consideration. *Id*. at 43-44. The *Tenzer* court explained that "[i]n sum, we do not now decide whether any of these [sentencing] factors [including voluntary disclosure]. . . constitute an appropriate basis for departure; we simply hold that their consideration has not been ruled out by our mandate in *Tenzer I*." *Id*. at 44.

24

Hansreudi Schumacher, in addition to the Deferred Prosecution Agreement and accompanying disclosures by UBS AG, were all well-publicized events. In fact, Defendant admits that *he knew of the UBS AG investigation and the indictment of Schumacher prior to his attempt to make a voluntary disclosure.* Doc. 24 at 12. Defendant could have declared his account at any time from 1996 though 2009, but instead filed false tax returns year after year. Defendant's attempted voluntary disclosure came only after defendant's asset manager was indicted, significantly increasing the chances that his undeclared account would be disclosed to the United States. It was clear the noose was tightening, and only then did defendant attempt to voluntarily disclose. Because defendant waited until he believed his crime would soon be discovered, his attempted disclosure is not much of a mitigating factor.

Defendant implies that he should have received notice from UBS AG prior to the bank's disclosure of his account records to the United States government. Doc. 24 at 20. Essentially, defendant asserts that if warned by UBS AG, he would have self-reported to the IRS earlier in an attempt to preempt prosecution. Inherent in this view is that but for the likelihood of discovery, the crime would have continued.

25

To the extent defendant argues that he should be treated similarly to individual taxpayers who completed a voluntary disclosure, he fails to recognize that his conduct is not similar to those individuals. A taxpayer who goes through the voluntary disclosure program must identify the source of the income, the reason for opening the offshore account, as well as detailing all meetings and communications with the foreign bankers and/or asset managers, and further agreeing to continue to cooperate with the Internal Revenue Service.[18] Defendant has not provided any such information. The government acknowledges that defendant was denied participation in the program, but nevertheless, nothing prevented defendant from providing such useful information to the government at any time.

Therefore, defendant's belated effort to preempt prosecution over a decade after the tax evasion began deprecates the seriousness of his crime and did little to mitigate the damage caused by the defendant's scheme against the United States.

---

[18] The information provided by individuals in the voluntary disclosure program has been crucial to the investigations and subsequent indictments of a Swiss bank and a number of bankers and independent asset managers, including: *United States v. Wegelin & Co. et al*, 12-CR-02 (S.D. NY); *United States v. Marco Parenti Adami et al.*, 11-CR-95 (E.D. VA); *United States v. Martin Lack*, 11-CR-60184 (S.D. FL); *United States v. Edgar Paltzer et al.*, 13-CR-282 (S.D. NY); and *United States v. Renzo Gadola*, 10-CR-20878 (S.D. FL).

C.   THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE,   TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

The defendant's willful and prolonged course of conduct deprived the United States of over $5 million in taxes, and a term of incarceration is just punishment to reflect the seriousness of the offense and to promote respect for the law.

Defendant has agreed to pay a significant civil penalty – 50% of the high balance of his Swiss bank account, or $53,552,238, for his failure to file FBAR forms for 1996 through 2007.   Doc. 15 at 10.   The civil penalty for willfully failing to file an FBAR is 50% of the high balance of the account for each year the defendant willfully fails to file an FBAR, up to six years.   31 U.S.C. § 5321(C)(i)(II) and (D)(ii).[19]   Defendant paid the agreed penalty amount on January 2, 2014.

However, the civil penalty alone does not provide just punishment for the defendant's serious pattern of conduct, as justice is not served when those that are able to pay penalties avoid any further criminal consequences.

---

[19] Despite the high amount of the penalty, Warner's penalty is not the maximum civil penalty allowable by law, as the IRS can assess 50% of the high balance of the account *each year* for six years.   *See, e.g., United States v. Carl Zwerner*, 13-CV-22082 (S.D. FL), Doc. 1. (the government moved to enforce the IRS's assessment of FBAR penalties of 50% of the high balance each year for four years in the case of a taxpayer who failed to report his UBS AG account).

Judge Adalberto Jordan, Southern District of Florida, explained that a defendant who failed to report his undeclared account should be sentenced to a term of incarceration:

> I understand that [the defendant] is going to have to pay, or has paid, significant tax penalties on the civil side, because his offenses occurred with regards to overseas accounts.
>
> And so, although that is certainly a factor I that I would take into account, it can't be one that simply calls for a probationary sentence. If that were the case, then an individual who had committed tax fraud, but still had the means to be able to pay civil penalties, could simply say 'I've done what I was supposed to do, I've been punished monetarily on the civil side, so I shouldn't serve any time in prison.' That's not the way things should work either.

*United States v. Jack Barouh*, 10-CR-20034, Doc. 27 at 26 (sentencing defendant to 10 months' incarceration). Moreover, while the defendant's penalty is a large dollar amount, it only accounts for slightly less than 3% of the defendant's total net worth.[20] A monetary fine alone is not adequate to reflect the seriousness of the offense, provide just punishment, or promote respect for the law.

Defendant argues that, as an alternative form of punishment, he should be given a term of probation, with community service as condition of

---

[20] The PSR reports Warner's net worth as $1,708,832,272; however, as noted above, that amount should be increased by $121 million to take into account an additional asset, the NPB account. PSR ¶ 75. Moreover, the approximate amount of the FBAR penalty was deducted from defendant's net worth in the PSR. PSR ¶ 75. Before deducting the FBAR penalty, defendant's net worth is approximately $1,883,432,272.

28

probation.  However, as discussed above, there are no factors which weigh in favor of an alternative form of punishment.  Defendant quotes extensively from the sentencing transcript of defendant David Shamilzadeh, who was given a term of home confinement and probation, with a requirement of 500 hours of community service to be performed by the defendant.  Doc. 24 at 33 (quoting *United States v. Shamilzadeh*, 04-CR-194 (E.D. NY), Sent. Transcript).  However, that defendant is not similarly situated to Warner, as the government moved for a downward departure for Shamilzadeh under § 5K1.1 because defendant "met with the Government approximately two dozen times," provided information about a number of other participants, and made "successful undercover tapes for months." *Shamilzadeh* Sent. Transcript at 6.[21]  While the Shamilzadeh court had reason to depart downward and impose an alternative sentence, there are not similar factors weighing in favor of such an alternative sentence in this case.

Accordingly, this Court should sentence defendant to a term of incarceration.

---

[21] A full copy of the *Shamilzadeh* sentencing transcript was provided to the Court and to government counsel by letter dated January 2, 2014; the transcript is Exhibit 8 in that submission.

### D.    THE NEED TO AFFORD ADEQUATE DETERRENCE

The introductory comments to Chapter 2, Part T of the Sentencing Guidelines states:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.   Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.   *Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.*   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.  (emphasis added).

In the United States, the tax system relies on voluntary compliance – that is, individuals correctly reporting to the IRS their true income earned and tax due and owing.  For voluntary self-assessment to be meaningful, fair, and productive of revenue, citizens must have confidence in the fairness of the taxation process and in the uniform, vigorous enforcement of the tax laws.  Repetitive and willful violations of the tax laws promote and encourage similar conduct by others, who may be tempted by the lack of consequence to do the same.  Unlike many crimes, tax offenses are frequently the subject of a cost-benefit-analysis in which the offender weighs the rewards with the risk of apprehension and punishment.  If taxpayers do not believe punishment is likely, the incentives to underreport income rise.

30

A sentence that does not include a term of incarceration will have much less deterrent effect, as taxpayers will be lead to believe that if they underreport their income, they can simply pay a fine and the tax due and owing, if and when caught, and not face any further consequences. A sentence of probation would further a public perception that a defendant of means can avoid further punishment simply by writing a large check.

Evading taxation by hiding money offshore is a quintessentially lucrative and difficult-to-detect activity, which is precisely when the need for general deterrence is most compelling.[22] *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011)

---

[22] The Guidelines Manual further explains that:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. The Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term of imprisonment for tax offenses is inconsequential in relation to the potential increase in revenue.

U.S.S.G. § 2T1.1, comment (backg'd).

(affirming as reasonable a within-Guidelines 32 month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

The government recognizes that defendant has no prior criminal history, and is unlikely to reoffend. However, this factor should not result in much, if any, variance from the Guidelines range, as defendant did engage in a pattern of underreporting income for over a decade that was stopped only after it became clear that defendant's scheme was likely to be uncovered by the United States government.

### E.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

Defendant suggests that other defendants who were charged with similar crimes received probation. While recognizing that each case turns on independent and unique facts, defendant's own facts and circumstances differ from those who received lesser sentences.

The government acknowledges that number of defendants who were convicted of crimes related to their failure to report foreign bank accounts were given probationary terms, however, in the vast majority of those cases, the defendants are not similarly situated to Warner because: 1) the undeclared account balance and/or the tax loss was much lower than

32

Warner's; 2) the defendant cooperated with the government and provided information about their foreign bank, bankers, and/or asset managers, unlike Warner; and/or 3) the defendant's advanced age was a mitigating factor.

For all eleven cases discussed in Defendant's Sentencing Memorandum at pages 31-33, the tax loss was either lower than defendant's tax loss, or there was no tax loss at all. *See, e.g., United States v. Igor Olenicoff*[23], 07-CR-227 (C.D. CA), Doc. 11 at 8 (plea agreement contains a Guidelines range of 6, based on no tax loss under U.S.S.G. § 2T1.1(a)(2)); *United States v. Jules Robbins*, 10-CR-333 (S.D. NY), Doc. 10 (no tax loss); *United States v. Paul Zabczuk*, 10-CR-60112 (S.D. FL), Doc. 19 (tax loss of $217,597); *United States v. John McCarthy*, 09-CR-784 (C.D. CA), Doc. 5 (tax loss between $200,000 and $400,000).

Additionally, in at least five[24] of the eleven cases discussed in Defendant's Sentencing Memorandum at pages 31-33, the government

---

[23] The *Olenicoff* case is also an outlier because Olenicoff was charged in 2007 and sentenced in early 2008, prior to the discovery of the scope and depth of the scheme to evade taxes perpetrated by UBS AG and its customers. Because the scheme was largely unknown, unlike most other offshore defendants, Olenicoff's Guidelines range did not include a two-level enhancement for sophisticated means. *See* Doc. 11 at 8.

[24] For the following cases, neither the plea agreement nor any sentencing memoranda are part of the publicly-available documents on PACER, so it is unknown whether or not motions were made under U.S.S.G. § 5K1.1: *United States v. Jules Robbins*, 10-CR-333 (S.D. NY); *United States v. Ernest Vogliano*, 10-CR-327 (S.D. NY) and *United States v. Jeffrey Chatfield*, 10-CR-4546 (S.D. CA).

recommended a reduction under U.S.S.G. § 5K1.1 due to the substantial cooperation of the defendant.[25]   In these cases, defendants provided information about the banks that held their undeclared accounts, as well as the bankers and independent asset managers who assisted them in opening and maintaining the undeclared accounts.  Warner has not provided any such information.

Defendant highlights the probationary sentence given to defendant Mary Estelle Curran.  Doc. 24 at 36.  However, Ms. Curran is not similarly situated to the defendant.   First, Ms. Curran was a housewife with no financial or business experience who inherited an undeclared account, not an accomplished businessman who built a toy company from the ground up and traveled to Switzerland himself to set up his undeclared account.  *United States v. Mary Estelle Curran*, 12-CR-80206 (S.D. FL), Doc. 33 at 9-11.  The sentencing Court specifically remarked on this distinction, stating "[t]his case

---

[25] *See, e.g., United States v. Stephen Rubenstein*, 09-cr-60611 (S.D. FL), Doc. 51 (government recommended a 33% reduction in the defendant's Guidelines range of 18-24 months); *United States v. John McCarthy*, 09-CR-784 (C.D. CA), Docs. 5, 32 (government made a sealed filing requesting a departure under § 5K1.1 from the Guidelines range of 24-30 months); *United States v. Juergen Homann*, 09-CR-724 (D. NJ), Docs. 4, 23 (government filed motion for downward departure under § 5K1.1 from Guidelines range of 30-37 months); *United States v. Paul Zabczuk*, 10-CR-60112 (S.D. FL), Doc. 29 (government's § 5K1.1 motion recommending a 33% reduction in the defendant's Guidelines range of 24-30 months); *United States v. Andrew Silva*, 10-CR-00044 (E.D. VA), Docs. 13, 14 (government moved under § 5K1.1 for a 50% reduction in the defendant's Guidelines range of 6-12 months).

is totally out of the scope of all [the government's other] case[s] where people are skimming, were trying to hide funds. I mean, this was an inheritance over there, and I think a lot of reasonable people would think you don't have to report this." Doc. 41 at 14.

Secondly, Ms. Curran was 79 years old and suffered from various health problems. Doc. 33 at 20. Third, unlike the defendant, Ms. Curran cooperated with the government by providing "all information known to her regarding . . . the conduct of all advisors, bankers, and lawyers who advised her and managed her foreign funds." *Id*. at 1. Fourth, Ms. Curran's tax loss was between $400,000 and $1,000,000 – at least $4,000,000 less than defendant's. Doc. 22 at 4. Fifth, unlike Warner, Ms. Curran filed amended tax returns and paid the estimated additional tax due and owing one month after she was notified she was rejected from the voluntary disclosure program, years before she pleaded guilty. Doc. 33 at 21-22. Based on these factors, the government did not oppose a term of probation for Ms. Curran. Doc. 41 at 13. Ms. Curran is not similarly situated to the defendant, and any disparity between her sentence and the defendant's would be warranted.

Finally, the sentencing table attached to Defendant's Sentencing Memorandum as "Exhibit 1" is not exhaustive, as it fails to include several

35

cases involving unreported offshore accounts where defendants did receive terms of incarceration.[26]  Additionally, defendant's  sentencing table fails to reflect: (1) the Guidelines ranges of the defendants, (2) the amount of tax loss, and (3) whether or not the government moved for a sentencing reduction under U.S.S.G. § 5K1.1.  Therefore, it is impossible to tell from the table whether or not any sentencing disparities between those defendants and Warner would be warranted.

A number of defendants who pleaded guilty of charges related to undeclared foreign bank accounts were sentenced to terms of imprisonment, including Jeffrey Chernick, as discussed above, and the following defendants:

- *United States v. Peter Troost*, 13-CR-185 (N.D. IL): Defendant pleaded guilty to one count of tax evasion in violation of 26 U.S.C. § 7201 in connection with his failure to report income from foreign bank accounts on his tax returns.  Doc. 12.  According to the plea agreement, the high balance of the accounts was $6,500,943, and the total tax loss, including relevant conduct,

---

[26] *See, e.g., United States v. David P. Alan*, 10-CR-160 (W.D. PA), Docs. 1, 64 (sentencing defendant to 21 months' imprisonment following a guilty plea to one count of tax evasion based on defendant's diversion of pre-tax income to an undeclared account in Nevis); *United States v. Arthur Allen Ferdig,* 09-CR-348 (C.D. CA), Docs. 24, 37, 43 (sentencing defendant to 18 months' imprisonment following a guilty plea to tax evasion based on defendant's diversion of corporate income to an undeclared account in Dominica, causing a tax loss of $148,000); *United States v. Mauricio Cohen Assor et al.*, 10-CR-60159 (S.D. FL), Docs. 224, 240, 241  (defendants each sentenced to 120 months' incarceration following a jury verdict of guilty on a number of tax charges and conspiracy, including charges based on defendants' concealment of assets and income in offshore entities and undeclared foreign bank accounts, causing a tax loss of over $10 million for each defendant).

was $1,039,343.  Doc. 12 at 6-7.  Troost was sentenced to a term of imprisonment of one year and one day.  Doc. 19.

- *United States v. Frederico Hernandez,* 10-CR-334 (S.D. NY): Defendant pleaded guilty to five counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1), in connection with his failure to report income from foreign bank accounts on his tax returns.  Doc. 11 at 7.  According to the government's sentencing memo, the high balance of the accounts was approximately $8.8 million, and the tax loss, including relevant conduct, was $510,193.  Doc. 11 at 3-4.  Hernandez was sentenced to a term of imprisonment of one year and one day.  Doc. 12.

- *United States v. Richard Werdiger*, 10-CR-325 (S.D. NY).  Defendant pleaded guilty to one count of conspiracy, in violation of 18 U.S.C. § 371, and two counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1), in connection with his failure to report income from his undeclared accounts on his tax returns.  Doc. 30.  According to the indictment, the highest account balance was $7,134,230, and according to a Department of Justice press release, the tax loss was "nearly $400,000."[27]  Doc. 2.  Defendant was sentenced to a term of incarceration of one year and one day.  Doc. 30.

- *United States v. Jack Barouh*, 10-CR-20034 (S.D. FL): Defendant pleaded guilty to one count of filing a false tax return in violation of 26 U.S.C. § 7206(1) based on his failure to report income from his foreign accounts.  Doc. 6.  According to the plea agreement statement of facts, the highest account balance was $10,017,613, and the tax loss, including relevant conduct, was $736,269.  Doc. 7 at 3-4.  The government filed a motion under U.S.S.G. § 5K1.1 based on defendant's cooperation, and defendant was sentenced to 10 months' imprisonment.  Docs. 18, 31.

---

[27] http://www.justice.gov/usao/nys/pressreleases/November11/werdigerrichard sentencingpr.pdf

The above list is not exhaustive, as other defendants who failed to report their undeclared foreign accounts have also received sentences of incarceration. Additionally, when seeking to avoid unwarranted sentencing disparities, the Court should look not only at other cases involving offshore tax evasion, but should also look to tax evasion cases generally. After all, defendant is no different than any other tax evader; his evasion is just on a much larger scale.

The advisory Guidelines range itself provides an objective range that promotes the goal of minimizing unwarranted sentencing disparities. *See, e.g., United States v. Mykytiuk*, 415 F.3d 606,608 (7th Cir. 2005) ("[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country"); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges themselves were designed to treat similar offenders similarly"). Treating similar offenders similarly "was the main goal of the Sentencing Reform Act" and "[t]he more out-of-range sentences that judges impose. . . the more disparity there will be." *Boscarino*, 437 F.3d at 638. Therefore, the Court should give serious consideration to the advisory Sentencing Guidelines, which call for a term of imprisonment.

38

## V. RESTITUTION AND FINE

As part of his plea agreement, defendant agrees to pay restitution to the United States Treasury in an amount to be determined at time of sentencing. Doc. 15 at 10. Defense counsel represented to the government that prior to sentencing, defendant will file amended tax returns to reflect income from his offshore accounts and pay any additional tax due and owing. The government has not yet received copies of filed amended tax returns from the defendant, but will update the Court at the time of the sentencing hearing regarding any unpaid tax liabilities and a computation of any restitution that may be due.

As reflected in the PSR, the advisory Guidelines range for the fine to be imposed is from $10,000 to $100,000. PSR ¶ 89, U.S.S.G. § 5E1.2(c)(3). Due to the defendant's large civil penalty, the government is not seeking a fine.

## VI.  CONCLUSION

For the foregoing reasons, the United States respectfully requests this

Court impose a sentence which includes a term of imprisonment.


Dated: January 7, 2014

                        ZACHARY T. FARDON
                        United States Attorney

              By:    s/ *Michelle Petersen*
                        Michelle Petersen
                        Patrick J. King, Jr.
                        Assistant United States Attorneys
                        219 S. Dearborn
                        Chicago, IL 60604
                        (312) 353-5300